# Illinois Official Reports

## Appellate Court

---

### *People v. Whitlock*, 2018 IL App (1st) 152978

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRELL WHITLOCK, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-2978 |
| Filed | December 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-8302; the Hon. Lawrence E. Flood, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Cunningham and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant-appellant, Darrell Whitlock, was arrested by Chicago police after the car he was driving crashed into another vehicle, killing its occupant. After his arrest, the State charged defendant with felony murder, attempted first degree murder of a peace officer, possession of a controlled substance, aggravated battery, criminal damage to government property, and aggravated fleeing. Thereafter, the State amended the felony murder charge to knowing murder and added a count of reckless homicide. Defendant sought to dismiss these new charges under the speedy trial statute, but the motion was denied by the trial court. Defendant proceeded to trial before a judge on the knowing first degree murder, reckless homicide, aggravated battery, and possession counts. The court found defendant guilty on the reckless homicide count and not guilty on all other charges. The trial court then sentenced defendant to 30 years' imprisonment.

¶ 2     Before this court, defendant raises two issues: (1) whether the knowing first degree murder and reckless homicide counts should have been dismissed because the State violated the speedy trial statute by failing to bring those charges within the required statutory time frame and (2) whether his Class 2 reckless homicide conviction should be reduced to a Class 3 offense because the State failed to prove he knew he was fleeing from police officers immediately before the crash that killed the victim.

¶ 3     For the reasons stated more fully below, we agree with the trial court that defendant's speedy trial rights were not violated. We affirm defendant's Class 2 reckless homicide conviction. The evidence presented by the State at trial was sufficient for the finder of fact to conclude defendant knew he was fleeing from the Chicago police.

¶ 4                                    JURISDICTION

¶ 5     On April 22, 2015, the trial court entered a guilty verdict for reckless homicide (Class 2). Defendant filed a motion for a new trial, which the court denied on June 11, 2015. On August 4, 2015, defendant was sentenced to 30 years in prison. Defendant filed a motion to reconsider his sentence, which the court denied on September 3, 2015. A notice of appeal was filed September 14, 2015. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                    BACKGROUND

¶ 7     On December 2, 2009, the State charged defendant-appellant, Whitlock, with three counts of felony murder, three counts of attempted murder, possession of a controlled substance with intent to deliver, eight counts of aggravated battery, two counts of criminal damage to government property, and six counts of aggravated fleeing. The State reindicted defendant on May 3, 2010. Count I changed from felony murder to knowing murder creating a strong probability of death or great bodily harm and two counts of reckless homicide were added.

¶ 8     On September 25, 2013, defense counsel filed a motion to dismiss the knowing murder and reckless homicide charges based on an alleged violation of section 103-5(a) of the Code of Criminal Procedure of 1963 (commonly known as the Speedy Trial Act) (725 ILCS 5/103-5(a)

(West 2012)). After hearing arguments from both the State and defense counsel, the trial court denied the motion to dismiss. The trial court found the knowing murder and reckless homicide counts were proper because the charges were not "new and additional." Defendant then proceeded to a bench trial.

¶ 9 At defendant's bench trial, the evidence established that on November 2, 2009, Chicago police officer Zdanys conducted narcotics surveillance at West 65th Street and Yale Avenue after receiving information from a nearby business owner that there was a "narcotics line" being conducted outside the business. After speaking to the business owner, Officer Zdanys viewed some video footage of the area. As a result of the conversation and video, the officer began to look for an older blue minivan. Officer Zdanys did not see a minivan at this location but did see cars lining up. The cars remained there for a short period of time and eventually Officer Zdanys followed one of those cars to the 6200 block of South Wabash Avenue, about a half-mile away. At 62nd Street and Wabash Avenue, the officer observed the car parking behind other cars but did not see the subject minivan. He departed the location shortly afterward because he needed "more help to set up a good surveillance."

¶ 10 The next day, November 3, 2009, Chicago police captain Sanchez was assigned to the Chicago Police Department and Drug Enforcement Administration's High Intensity Drug Trafficking Area task force, which "targeted narcotics offenders with a high propensity for violence." Captain Sanchez's team included 8 to 10 officers from the Chicago Police Department including Officers Utreras, Zdanys, Norway, and Wilson. The team was investigating a person selling narcotics out of a minivan on the south side of the city of Chicago.

¶ 11 On this day, Captain Sanchez drove a black Ford Edge, and his partner in the vehicle was Officer Utreras. Officers Zdanys and Norway were in a brown Buick LaCrosse. While those two cars were "covert vehicles," both were equipped with blue and red strobe lights on top of the front windshield, oscillating front headlights, and strobe parking lights on the back, front, and sides of the vehicles. The team was using unmarked cars, "two-man" cars equipped with police lights, "because at some point we know that those vehicles will have to be used as enforcement vehicles." Officer Wilson was alone in his surveillance vehicle, which was not equipped with emergency equipment. While the officers were in civilian clothes, they all wore marked Chicago Police Department protective vests, had their police stars displayed around their necks or belts, and also wore their duty gun belts. Captain Sanchez testified his vest was "clearly marked [with] police on it" and also had "an embroidered star." The word "POLICE" was also in big gold letters on the back of his vest. Officer Zdanys's vest had "Police" on the front pocket. According to Officer Wilson, the team anticipated "making a stop on the individuals involved in the narcotics transaction in that area" so they all wore marked police vests for their own safety.

¶ 12 The team went to 65th Street and Yale Avenue around 6 a.m. to investigate a "dope line." Captain Sanchez and Officer Zdanys explained that a dope line occurred "when a group of individuals form a line and someone pulls up or sometimes they open their—their drug hours and they end up selling to every single person in that line." This allows narcotics sales to be done "very quickly." The police team viewed the video provided by the business owner prior to driving to the location that morning. The officers were again looking for a blue, older model minivan. The team set up both fixed and roving surveillance once there. Officer Wilson set up stationary surveillance at 65th Street and Yale Avenue.

¶ 13    Tyree Smith testified that he had known defendant from the neighborhood for "quite a while." Defendant picked Smith up around 6 a.m. so that Smith could do his "dealing" at 62nd Street and Wabash Avenue. Smith denied receiving heroin from defendant. Smith sold drugs for himself and "quite a few peoples."

¶ 14    When the officers initially arrived at 65th Street and Yale Avenue, they saw neither a "dope line" nor the minivan. Officers Zdanys and Norway radioed their team members that they were relocating to the secondary location at 62nd Street and Wabash Avenue. At that location, Officer Zdanys saw a group of cars on one side of the street but still did not see the older model blue minivan. Officers Zdanys and Norway decided to circle the block. When they returned to the corner, they saw the blue minivan parked in front of several cars facing northbound.

¶ 15    Officers Zdanys and Norway then drove past the blue minivan and saw defendant in the driver's seat. Officer Zdanys also saw a man, later identified as Tyree Smith, standing at the first vehicle in the line of cars, engaging in what Officer Zdanys believed to be an illegal drug transaction. Smith sold to "numerous cars" at that location, and the officers did not stop the transactions but continued to drive down the street. They notified Captain Sanchez that the "drug operation" they were looking for was located at 62nd Street and Wabash Avenue.

¶ 16    As Officer Zdanys drove the brown Buick LaCrosse, he made eye contact with defendant. Officer Zdanys testified "I think they kind of knew we were the police. I think the gig was up." Smith left defendant's van to sell to a third buyer and saw two white men. Smith could not remember if defendant yelled at him to come back to the minivan. After passing the minivan, Officer Zdanys, looking from his rear view mirror, noticed Smith running back toward the minivan. Officer Zdanys saw Smith enter the van. In his trial testimony, Smith claimed he did not recognize the two white men as police officers.

¶ 17    Smith and defendant "rolled off in a rapid—like a rapid pace." Officers Zdanys and Norway made a U-turn and followed the minivan. Smith knew the brown car was following him and defendant. Around 7:30 a.m., Officers Zdanys and Norway radioed the other team members what had just occurred.

¶ 18    Captain Sanchez and Officer Utreras drove to join Officers Zdanys and Norway, who had continued to relay the path defendant and Smith were driving in the minivan. Officer Zdanys had not yet activated his emergency police lights on the brown LaCrosse because he was waiting for other team members to arrive.

¶ 19    Officer Zdanys followed the van to 63rd Street and King Drive, where the minivan stopped in the right lane at King Drive, facing eastbound. Officers Zdanys and Norway pulled up behind the minivan. Captain Sanchez then drove up to the corner. While the light was still red, Captain Sanchez drove his car in front of the minivan and parked perpendicular to it thereby blocking the minivan. Upon exiting his vehicle, Captain Sanchez announced his office and saw defendant shake his head "no." The parties stipulated that this was not recorded in any police report.

¶ 20    Captain Sanchez and Officer Zdanys activated the emergency lights in their vehicles. Officer Zdanys saw Captain Sanchez's car had all its lights activated as it came on the scene. Officers Zdanys and Norway exited their car and began to approach the minivan from each side. Upon seeing the officers, Smith raised his hands and defendant reversed the minivan into Officer Zdanys's car and then went forward, hitting Captain Sanchez's car. The minivan's side mirror struck Officer Zdanys's shoulder while also trapping him between the minivan and a

Jeep stopped in the left turn lane. Smith claimed he did not know the men in the cars were police. However, Officer Zdanys approached the driver's side door yelling "Police, let me see your hands. Police. Let me see your hands."

¶ 21　　A blue Jeep driven by Robert Myers was stopped in the left turn lane at the intersection of 63rd Street and King Drive. He saw a blue minivan approach the light "at a high rate of speed" and then veer to the right of his Jeep before stopping at the intersection. Myers had his windows up, and music played in his car while he sat at the stoplight. Myers saw a white man with a gun partially out of the sport-utility vehicle (SUV) but could not hear anything and did not notice any markings on the clothing indicating the individual was a police officer. He did not see any emergency lights on but also did not notice the car behind the minivan nor did he see the officers approaching from behind.

¶ 22　　Officers Norway, Zdanys, and Utreras all claimed they were screaming "police" while simultaneously ordering the occupants out of the minivan. Officer Utreras opened the passenger side door of his car and announced his office by yelling "Police." He drew his weapon but kept it pointed at the ground. He had not completely exited his SUV because of a fear of being pinned if the minivan moved forward. Myers saw the passenger of the black SUV pull out a gun but remain partially in the vehicle. Upon seeing the minivan strike Officer Zdanys, Officer Utreras fired a single shot through the van's front window. Officer Zdanys heard the gunshot. Myers immediately moved his Jeep after hearing the gunshot.

¶ 23　　Defendant shifted the minivan into drive and "squealed the tires" before trying to drive through the opening between Captain Sanchez's car and Myers's Jeep. Smith claimed the defendant moved the car forward to get out of harm's way. Officer Wilson watched the minivan "ram[ ] the cars." Defendant's minivan struck the rear of Captain Sanchez's car, "forcing it to turn a little bit." Defendant then "sideswiped" the Jeep before accelerating at a high rate of speed eastbound on 63rd Street.

¶ 24　　All witnesses agreed the minivan was traveling at a high rate of speed. Officer Utreras testified the defendant was driving "at least" 60 miles per hour. Smith claimed that they were going "probably 75, maybe more." Officer Wilson attempted to follow. He was traveling at 45 miles per hour but was unable to gain any ground on the minivan. Captain Sanchez also engaged in the pursuit. Myers noticed the flashing oscillating lights on the unmarked cars as they left to pursue the minivan.

¶ 25　　As defendant sped down 63rd Street, Smith looked in the rear view mirror and saw the cars giving chase. He claimed that the police did not have their emergency lights on until after they passed King Drive. As the chase occurred, 42-year-old Valerie Davis left her house driving near 63rd Street and St. Lawrence Avenue to go to work. Jackie Brown was also driving on his way to work and was stopped at the corner of 63rd Street and St. Lawrence Avenue facing westbound. Brown saw Davis's car traveling northbound on St. Lawrence Avenue, which had the green light. The traffic on 63rd Street had the red light. As Davis proceeded through the intersection, Brown observed the minivan driven by defendant also enter the intersection and collide with the driver's side door of Davis's car. He believed the minivan was going 60 to 70 miles per hour. Officer Wilson, driving behind defendant, observed the collision and never saw defendant brake. Brown testified, "[t]hat [Davis's] car spun out of control, it slammed into the side of my car on the driver's side, then spun behind me." The minivan then spun around, and the rear of the minivan also hit the front of Brown's car. Smith was scared and did not look

- 5 -

forward, then "all of the sudden" he heard and felt a crash and was "shoved into the dash board [*sic*]." The airbags deployed.

¶ 26    Davis's car continued past Brown's car for about 60 to 70 feet, while the minivan came to a stop on the front of Brown's car. Officer Wilson observed Davis's car "launch" 100 to 150 feet east and land in the westbound lane on 63rd Street. As Captain Sanchez and Officer Utreras chased the minivan, they observed an "explosion" and further saw "a huge amount of smoke and dust." As they reached 63rd Street and St. Lawrence Avenue, they realized defendant struck another car. When officers arrived, they found both defendant and Smith in the minivan. Brown saw the police draw their guns within a few seconds of arriving. Officer Wilson got out of his car and drew his weapon. He then approached the passenger side of the van, announced his office, and ordered both men to raise their hands and exit the vehicle. Smith complied but was "woozy, slow to respond."

¶ 27    Brown went over to Davis's car and saw that she looked like she had been knocked out. He tried to reach into the car and wake her up, but an officer yelled at him to stop. Officer Wilson found Davis unconscious and unresponsive. He yelled for Captain Sanchez to call an ambulance. He observed her neck to be in an "unnatural position," and he could detect no pulse. Both Brown and Officer Wilson testified that the video footage obtained from a nearby church accurately reflected the events of the accident.

¶ 28    Officer Wilson returned to the minivan and noticed numerous blue-tinted plastic bags of suspected narcotics on the floor and in the dashboard area. He also observed money and cell phones. Smith was taken out of the minivan, placed into an ambulance, and taken to St. Bernard Hospital. He was released the same day and arrested for possession of a controlled substance. Davis was transported to Christ Hospital, where her family was informed that she had died from her injuries. Smith pled guilty to narcotics possession and was sentenced to eight years in prison.

¶ 29    The parties entered into several stipulations. They agreed the crash scene was photographed, videotaped, and evidence was recovered. The bullet Officer Utreras fired was recovered from inside the dash of the minivan. The shell casing was recovered from the passenger side floor board of the Ford Edge driven by Captain Sanchez. Also recovered was $50 and large bags that contained 100 smaller bags of 35.6 grams of suspected heroin, 44 of which tested positive for a total of 15.7 grams of heroin.

¶ 30    The parties stipulated that if called to testify Assistant State's Attorney (ASA) Collins would state that Smith spoke with her and Detective Fassl after his arrest. In a written statement to the ASA, Smith admitted he sold heroin for the defendant, he knew the two white men at 62nd Street and Wabash Avenue were police, and defendant yelled for him to return to the minivan. He claimed defendant shoved the drugs into the glove compartment and knew the white men at 63rd Street and King Drive were police officers. He also told the ASA that defendant put the minivan in reverse and then heard the gunshot.

¶ 31    It was also stipulated that ASA Peterson presented Smith to a Cook County grand jury the day after the crash and he testified as follows: he sold heroin for defendant; defendant picked him up on November 3 at 6:30 or 7 a.m.; they went to 62nd Street and Wabash Avenue to sell heroin; Smith sold heroin to two people there because they called defendant and, when he went to make the third sale, defendant called him back to the minivan; Smith believed he was called back because defendant realized the white men were police; it was not normal for defendant to call him back when customers were still waiting; he gave the heroin and cash back to

defendant; defendant placed the drugs in the dash board; the Buick made a U-turn and followed them and he believed that to be a police car; after being blocked in at 63rd Street and King Drive, he raised his hands because he believed the men were police because "ain't no white people going to try and rob us doing this"; and he heard the gunshot after defendant reversed the minivan. The State rested.

¶ 32     Defendant made a motion for a directed finding, which the trial court denied. It was then stipulated that Officer Utreras told Detective Dougherty, who then told Officer Strugala that Officer Utreras fired a shot at the vehicle as it was driving at him. It was further stipulated that Captain Sanchez did not tell investigating officers that he announced his office and defendant shook his head.

¶ 33     After hearing the above testimony and evidence, the trial court concluded defendant "was aware" that the Chicago police were behind him and in front of him at the corner of 63rd Street and King Drive. The trial court then entered a finding of guilty on the reckless homicide charge. The trial court entered a not guilty finding on the other charges. Defendant's motion for a new trial was denied.

¶ 34     At sentencing, the State argued for the maximum allowable sentence, 30 years. Defendant had been convicted of murder at 15 or 16 years old and finished serving his 27-year sentence in 2005. He also pled guilty to possession with intent to deliver and received a 4-year sentence in 2006. Defendant apologized to the victim's family. After reviewing the aggravating and mitigating factors, the trial court sentenced defendant to 30 years' imprisonment. The motion to reconsider sentence was denied.

¶ 35     This timely appeal followed.

¶ 36                                              ANALYSIS

¶ 37     In his first issue, defendant argues the trial court erred when it failed to dismiss the knowing first degree murder charge (720 ILCS 5/9-1(a)(2) (West 2016)) and reckless homicide charge (*id.* § 9-3(e-7)(2)) filed after defendant had been in custody for over 120 days. The Speedy Trial Act provides "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2016). The remedy for a speedy trial violation is dismissal of the charges. *Id.* § 103-5(d). The parties agree there are no factual disputes in the record and the issue presented is purely a question of law. Therefore, a *de novo* standard of review applies. *People v. Dunnavan*, 381 Ill. App. 3d 514, 517 (2008).

¶ 38     When the State charges a defendant at different times with factually related offenses, as occurred here, the speedy trial guarantee is tempered by compulsory joinder. *People v. Williams*, 204 Ill. 2d 191, 198 (2003). The relevant compulsory joinder provision states:

> "(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.
>
> (b) If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution *** if they are based on the same act." 720 ILCS 5/3-3 (West 2016).

- 7 -

Illinois courts have explained how the compulsory joinder provision and speedy trial provision affect a defendant's rights:

> "Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained." *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981).

Illinois courts enforce this rule in order to "close a loophole [that] would [otherwise] allow the State to circumvent a statutorily implemented constitutional right [to a speedy trial]." *Williams*, 204 Ill. 2d at 207. The rationale for the rule is to ensure defendant has "adequate notice of the subsequent charges to allow preparation of a defense." *People v. Phipps*, 238 Ill. 2d 54, 67 (2010). Illinois courts therefore apply the *Williams* rule "only when the subsequent charge filed by the State is 'new and additional.' " *People v. Staake*, 2016 IL App (4th) 140638, ¶ 51, *aff'd*, 2017 IL 121755. "If the original charging instrument gives a defendant adequate notice of the subsequent charges, the ability to prepare for trial on those charges is not hindered in any way." *Phipps*, 238 Ill. 2d at 67.

¶ 39 Before this court, defendant argues the knowing first degree murder and reckless homicide charges, filed 179 days after he was taken into custody, were "new and additional" charges and therefore subject to dismissal.

¶ 40 We agree with the trial court that knowing first degree and reckless homicide were not "new and additional" counts for the purpose of a speedy trial analysis. Pursuant to *Phipps*, our analysis begins by comparing the original and subsequent indictments. *Id.* "The focus is on whether the original charging instrument gave the defendant sufficient notice of the subsequent charges to prepare adequately for trial on those [new] charges." *Id.*

¶ 41 Illinois law is settled, and courts in this state have repeatedly affirmed only one offense of murder exists even though it may be committed in numerous ways. See *People v. Smith*, 233 Ill. 2d 1, 16 (2009) ("While our statute describes three 'types' of murder, first degree murder is a single offense. As we have explained on numerous occasions, ' "the different theories embodied in the first degree murder statute [citation] are merely different ways to commit the same crime." ' [Citation.]"); see also *People v. Maxwell*, 148 Ill. 2d 116, 137 (1992) ("Illinois law recognizes only a single offense of murder, which may be committed in a variety of ways."). In *Maxwell*, the supreme court explained, "[j]ust as the method of committing murder is not integral to the offense and therefore need not be specified in the charging instrument [citation], *** the precise statutory theory of the offense of murder is not a matter that must be specifically alleged." *Maxwell*, 148 Ill. 2d at 137.

¶ 42 After reviewing the indictments in the case, defendant was sufficiently apprised that the State would attempt to prove defendant committed murder when he caused the death of Davis. The original 2009 indictment apprised defendant that the State intended to seek a first degree murder charge against defendant for the crash which resulted in Davis's death. Additionally, the 2010 indictment gave defendant notice that the State would proceed under the knowing theory of murder instead of felony murder theory in the death of Davis. The change in murder theory between the two indictments is of no consequence because the original indictment

- 8 -

placed him on notice that he could be tried for murder under any of the three murder theories recognized in Illinois. See *id.*

¶ 43 Both indictments provided notice to defendant of the conduct he would need to defend against. The 2009 felony murder charge was based on the chain of events set in motion by defendant (*i.e.*, fleeing in the minivan and striking Davis). The 2010 knowing murder charge was based on defendant "strik[ing] and kill[ing] Valerie Davis with a motor vehicle." Moreover, the original indictment also contained several counts of aggravated fleeing or attempting to elude a police officer. These counts gave defendant notice that his conduct after fleeing 63rd Street and King Drive would be an issue he needed to defend against.

¶ 44 We also agree with the State that the reckless homicide count was not "new and additional." As already explained, the 2009 indictment put defendant on notice that he would have to defend himself against "the chain of events that caused the death of Valerie Davis." The "chain of events" broadly referred to defendant's use of the minivan on November 3, 2009, which crashed into and killed Davis. More specifically, the original indictment put defendant on notice that the State intended to hold him accountable for the death Davis and he should prepare his defense related to his conduct in driving and hitting her. We again note that defendant was also charged with aggravated fleeing or attempting to elude a police officer based on his conduct in driving the minivan. This also gave him notice of what he would have to defend against. *Phipps*, 238 Ill. 2d at 69 (noting the critical point of speedy trial analysis is whether the original indictment gave defendant adequate notice to prepare his defense to the subsequent charge).

¶ 45 Importantly, defendant cannot demonstrate prejudice as a result of the new indictment. The State originally indicted defendant in December 2009 and then reindicted him in April 2010. Defendant's motion seeking dismissal on speedy trial grounds was filed 3½ years later in September 2013. Defendant did not go to trial until April 2015. Based on the almost five-year gap between the reindictment and trial, defendant cannot complain the reindictment resulted in a "trial by ambush." Defendant was also not at risk of being exposed to double jeopardy. Illinois's recognition of a single offense of murder means " '[a] conviction on any one of the theories of first degree murder operates to bar a second trial on a theory not prosecuted.' " *People v. Cooper*, 194 Ill. 2d 419, 429 (2000) (quoting *People v. Daniels*, 187 Ill. 2d 301, 316 (1999)). The trial court's not guilty finding on the knowing murder charge prevents the State from later retrying defendant for felony murder or intentional murder in the death of Davis.

¶ 46 For the reasons stated above, we conclude that defendant's statutory right to a speedy trial and compulsory joinder were not violated by the addition of the knowing murder and reckless homicide charge. Those charges were not "new and additional" for speedy trial and compulsory joinder purposes.

¶ 47 In his second issue, defendant argues the State failed to present sufficient evidence to convict him of reckless homicide in the death of Davis. He argues that the evidence failed to demonstrate he knew the individuals who stopped him and subsequently chased him were police officers. Since he did not know the men were police, he argues his conviction should be reduced from a Class 2 conviction to a Class 3 conviction.

¶ 48 When a defendant argues the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, the

appellate court will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the trier of fact's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). While the trier of fact's findings regarding witness credibility are entitled to great weight, the determination is not conclusive. *Smith*, 185 Ill. 2d at 542. The fact that the fact finder accepted testimony as true does not guarantee that it was reasonable to do so. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). However, an appellate court will only reverse a conviction where "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 185 Ill. 2d at 541.

¶ 49    Subsection (e-7) provides that a reckless homicide charge can be a Class 2 felony if the defendant "was operating a vehicle while failing or refusing to comply with any lawful order or direction of any authorized police officer." 720 ILCS 5/9-3(e-7) (West 2016).

¶ 50    In arguing that he could not have been aware the individuals who stopped and subsequently chased him were police officers, defendant relies on the testimony of copassenger Smith, and Myers, who was in the Jeep at the corner of 63rd Street and King Drive. Myers testified that he did not see police lights or hear the officers yell "police" while stopped at the corner. He did admit that he had his windows rolled up and he was playing music inside his car. At trial, Smith denied any knowledge that the white individuals who confronted them at 63rd Street and King Drive were police. He claimed not to have seen police lights or any identifying characteristics on the officers' clothes.

¶ 51    We reject defendant's exclusive reliance on the testimony of Smith and Myers. Defendant's argument is premised on reweighing the evidence, rejecting the trial court's factual findings, and substituting his view of the evidence for the trial court's view. *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) (a reviewing court has neither the duty nor the privilege to substitute its judgment for the trier of fact). The trial court heard the testimony of Smith and Myers, but also heard from several of the police officers involved in the encounter. In finding defendant guilty, the trial court chose to believe the testimony of the police.

¶ 52    The trial court's reliance on the testimony of the officers involved was not unreasonable. The officers all testified to identifying themselves as police at the initial encounter at 63rd Street and King Drive. Upon pulling perpendicular to defendant's minivan, Captain Sanchez activated police lights, which included red and blue strobe lights in the front of the windshield that "permeated forward," along with oscillating front headlights and a "mars bar." Officer Zdanys could see the police lights of Captain Sanchez's car from where he stood behind the minivan. Upon seeing Captain Sanchez, Officer Zdanys activated the emergency lights on his car. Officer Zdanys then exited his vehicle and announced his office by yelling "Police!" Captain Sanchez also exited his vehicle and announced his office. Officer Utreras also announced his office after exiting his vehicle to confront defendant. Moreover, all the officers testified to wearing various pieces of clothing embossed with the word "Police." Each officer also had their police star visible.

¶ 53    At trial, Smith may have denied having knowledge that the individuals were police, but his police statement and grand jury testimony conflict with this and indicate he and the defendant were aware the individuals were police from the time they first encountered them at 62nd Street and Wabash Avenue. Moreover, his trial testimony did establish that he knew it was the police chasing them after defendant had fled from the corner of 63rd Street and King Drive. This is confirmed by the video evidence, which shows officers arriving at the scene of the crash

with their emergency lights activated. While Myers denied noticing the men were officers when the initial confrontation occurred, he admitted he noticed the activated police lights when the officers began their pursuit of defendant's minivan.

¶ 54 After reviewing the evidence in a light most favorable to the State, a finder of fact could reasonably conclude the defendant was aware the men confronting him at the intersection of 63rd Street and King Drive were Chicago police. We therefore affirm his Class 2 reckless homicide conviction.

¶ 55                                    CONCLUSION

¶ 56 For the foregoing reasons, we affirm the trial court's finding that no violation of the Speedy Trial Act occurred. We affirm defendant's conviction for reckless homicide (Class 2).

¶ 57 Affirmed.