**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180046-U

Order filed December 7, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| | ) | Appeal No. 3-18-0046 |
| v. | ) | Circuit No. 13-CF-147 |
| | ) | |
| JENNIFER J. REED, | ) ) | Honorable Cynthia M. Raccuglia |
| Defendant-Appellant. | ) | Judge, Presiding |

_____

JUSTICE O'BRIEN delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Trial court erred when it found defendant guilty of theft as evidence was insufficient to sustain the conviction.

¶ 2     Defendant Jennifer J. Reed was convicted after a bench trial of theft based on deception and unauthorized use of funds from a charity which she directed. Reed was sentenced to 48 months' probation. She appealed. We reverse Reed's convictions.

¶ 3                                                    FACTS

¶ 4    In 2003, a number of Catholic religious orders came together to form a charitable organization called Pathways to Hope (PTH). The initial orders designed the charity to be comprised of two boards. The first board was comprised of the provincials, who serve as the superiors of a group of priests or brothers, and was called the board of trustees. They also created a board of directors, which included lay representatives. PTH was created to serve as a liaison between victims of priest sexual abuse and the Catholic church. PTH would provide resources to the victim in order to help them overcome challenges they may face as survivors of sexual abuse. In order to fund the charity, each of the initial member provincials contributed seed money. The board of trustees hired Jennifer Reed as the executive director of PTH in February 2004. PTH offered a wide variety of services to victims, the costs of which were billed to the provincials. Reed's services and administrative costs were also billed to the provincials.

¶ 5    Reed was terminated from her position and the State filed three theft charges against her in March 2013. See 720 ILCS 5/16-1(a)(2)(A) (West 2012). The first charge alleged Reed paid her personal gas bill of $908.48 with a PTH check. The second count alleged Reed wrote herself a check in the amount of $8898.86 and the third count alleged she wrote herself a check in the amount of $2065. A fourth theft charge was added in July 2013, alleging Reed exercised unauthorized control over between $100,000 and $500,000 of property belonging to PTH. See 720 ILCS 5/16-1(a)(1)(A) (West 2012).

¶ 6    Prior to trial, the parties engaged in discovery disputes. The court reviewed the existing client files and found the files discoverable. Reed maintained discovery, including the client files, was incomplete. Client files were empty, bank statements were not included and other documents, such as audits, were not turned over. The trial court granted Reed's motion to compel in March 2015 and the State turned over additional discovery in August 2016. Reed maintained the files

2

were still incomplete. She filed additional motions to compel, which the trial court granted. The State provided an affidavit that discovery was complete, and the court ruled that the State would not be able to use any non-tendered evidence.

¶ 7    Reed waived her right to a jury trial and the cause proceeded before the court. Two stipulations were presented. The first one stipulated to the foundations for the business records from First Midwest Bank, Bank of America and Nicor. The second stipulation indicted there were 112 victim files, some of which were empty, and according to the State, no other files existed.

¶ 8    Keith Zekind testified for the State. He was the director of finances and executor director of development at the Congregation of the Passion of the Holy Cross province in Park Ridge. He also served as treasurer of PTH. His role there involved overseeing the financial statements and giving reports to the two governing boards. He provided regular financial reports to the board of directors, based on information provided by Reed. The numbers she gave him looked reasonable, so he did not see a need to look further into the finances. Reed handled the day-to-day activities of the charity. As executive director, Reed's role was to work with religious institutions and priest sexual abuse victims to assist the victims in the healing process. To his knowledge, there were no PTH clients in La Salle County but there could have been some located in northern Illinois. He was not privy to the client information. Reed worked from home and had a part-time administrative assistant at the office. Reed was well-respected.

¶ 9    Zekind became aware of the PTH financial issues after calls from Bank of America that the PTH account was overdrawn and from the insurance company that the insurance premium had not been paid. In Zekind's view, there should have been sufficient funds to pay the bills. He asked Reed about it, she said she would take care of it, and she did. He discovered that she had opened a second PTH checking account at First Midwest Bank without board approval. Zekind did not know

3

when Reed obtained a PTH credit card. He was not aware whether she had permission to use the card for personal expenses. He was unaware of the charity's financial situation. After Reed was terminated, a forensic evaluation of the charity was performed. PTH eventually declared bankruptcy.

¶ 10    Zekind said he went through the charity's credit card and checking account statements with law enforcement to identify expenses that were not business in nature. He reviewed the same statements on the stand and indicated non-business expenses. For example, in February 2006, there were plane tickets charged for Reed's children. The June 2009 credit card statement indicated the account was two statements past due. Another bank alert in 2009 or 2010 warned that there was $11,695.19 due on the credit card, which amount was over its $10,000 limit. Zekind reviewed the statements from Reed's personal checking account which showed that she wrote checks for the charity's insurance premiums and to purchase computers for the office. To his knowledge, Reed did not have authority to use the PTH credit card for cash advances. He assumed the PTH Bank of America checking account was paying the credit card bills. As far as he was aware, Reed was not authorized to write checks to herself for cash or her personal finances. He identified the PTH check Reed wrote to Nicor for $908.48 for her home utility payment. To his knowledge, Reed did not have permission to write the check.

¶ 11    On cross-examination, Zekind acknowledged he did not know when the Bank of America checking account for PTH was opened or whether there were other signatories on the account. He assumed Reed lacked authority to make the non-business expenses. The conclusion was his "educated guess." The provincials gave individual directives to Reed and he did not know what they told her to do, how the records were kept or what was in the client files. He did not look at the client files. Zekind identified the deposit account signature card for the Bank of America

4

checking account that indicated it was opened in June 2004. PTH began operating in February or March 2004. He did not recall how the early bills were paid before the account was opened. He did not know if Reed was paying the bills, including the assistant's salary and insurance premiums. If she did pay the bills, she would be entitled to reimbursement. Zekind was also unaware if the provincials arranged paybacks to Reed. He would have had to check with all the provincials to determine the extent of her authority. No one in the investigation talked to the provincials.

¶ 12        It was possible that the unauthorized expenses could be explained by looking for the invoices, receipts, memos and emails from the provincials documenting and approving the services and expenditures. He did not know who the recipient of charges on the credit card was or if there was a receipt for the charge in the client's file. He did not know if the provincials checked the bills. He did not know about the purchases Reed made. He did not know about a Florida vacation Reed took as a guest of the provincials. Zekind did not review Reed's personal checking account to see if she was reimbursing herself with the PTH checks at issue. Zekind did not directly receive the PTH bank statements and they were seldom provided by Reed. He received an email from the payroll processing company about low funds and Bank of America sought a meeting because of the account's overdrafts. It was his "educated guesses" that the expenses were not authorized.

¶ 13        When the charity started, he determined as treasurer not to invest any of the seed money. In his opinion, it was not reasonable because of the small amount of funds and how the funds were to be spent "from a cash flow perspective." The insurance company brought the financial issues to the provincials' attention and filed the lawsuit. A forensic accounting was provided to the insurance company attorneys. Zekind did not perform an audit and was not aware of an outside audit being performed. He reviewed minutes from a May 2006 board meeting which ordered that an audit be performed. He did not know if it was done. He acknowledged the charity's standard

operating procedure regarding finances was not followed. For example, bank statements should have been provided to him and any expenses over $5000 needed a second signature to be paid. He also acknowledged that board minutes from April 2010 indicated a $7000 deficit because the provincials had not paid their annual dues.

¶ 14    Anna Wasylyszyn testified. She was a general criminal investigator with the Illinois State Police and investigated Reed's alleged theft. In investigating the theft, Wasylyszyn went through the State's exhibits, including the Bank of America credit card statements and Reed's checking account statements, with Zekind. In her estimation, Reed wrote between $10,000 and $11,000 in checks to PTH from her personal account, although Wasylyszyn was not sure of the exact amount. Checks from the PTH First Midwest account to Reed totaled more than $70,000 but there was not $70,000 in reimbursements. The checks from the Bank of America account to Reed's personal checking account totaled more than $55,000. The Nicor statement established Reed's account was referenced on the $908.48 check paid from PTH funds. The credit card statements indicated cash withdrawals that were later deposited into Reed's checking account. Wasylyszyn did not subpoena Reed's personal credit card statements. She did not talk to the provincials. She spoke only to Zekind and performed no further investigation.

¶ 15    The State completed its case-in-chief and Reed moved for a directed verdict, which the trial court denied.

¶ 16    Reed took the stand in her defense. She had a bachelor's degree in criminal justice, a master's degree in counseling psychology and a doctoral degree in business administration. She was a licensed clinical professional counselor. She began as PTH executive director in February 2004, with the first client served in March 2004. At that time, PTH did not have a bank account. She paid the rent, insurance premiums and salaries from her personal checking account. The PTH

6

checking account was opened in June 2004. She estimated PTH served more than 300 clients in total. On her review, the client files were not intact, and more than 200 files were missing. For example, in a file for M.C., where PTH paid fitness dues for the client, there were no bills or reports in the file. Another client file, for R.S., lacked receipts and progress reports.

¶ 17    Reed explained that each client had two files. The first file included the religious community involved and the communications with it, and the billing, invoices and receipts Reed sent to the provincial. The second file included the victim information, the services provided, the treatment plan, bills and receipts. She was provided wide latitude from the provincials in managing clients and received approval directly from them. She billed the provincials monthly for her time and the victim expenses. The provincials did not object to the expenses, but she always received permission before spending the money. Some expenses approved by the provincials included drug and alcohol rehabilitation, purchases of a small pickup and a car, rent payments, grocery purchases, massages and haircuts.

¶ 18    Reed went through a number of files, recalling the client and the services provided. For example, G.D. lived in southern Illinois and was one of a group of women who were molested by a priest in northern Indiana in the 1950s and 1960s. Her services included time at retreats, new tires for her vehicle, payment of her energy bill and the purchase of groceries. D.D., a client living in Ohio, received a one-time payment of $22,000. T.M., a client in Hawaii, received advance payment for his therapy and living expenses for his family, including rent and clothes. In addition, Reed flew to Hawaii to assist him. PTH often paid client's utility and cell phone bills. The trial court took judicial notice of the files, noting that it had gone through them during its *in camera* review.

¶ 19    Reed told Zekind that PTH was out of money and sent him emails to that effect. At some point during her tenure as director, the Bank of America checking account was frozen and Reed was required to obtain permission from a banker in order to write a check. Reed opened the First Midwest account a couple of months after the Bank of America account was frozen because she needed the ability to pay the bills. She informed Zekind that she opened the account. However, he never indicated there were financial problems in 2008, and in 2009, Zekind said the finances were in good shape. In December 2010, William Yacullo, the PTH board of directors' president, and Zekind confronted Reed, asked for bank statements and told her to keep her mouth shut. In February 2011, she was told to work exclusively from home because of a client issue. She was then placed on leave and terminated.

¶ 20    Reed testified that PTH suffered financial limitations. She went several months towards the end of her tenure without a paycheck, in part because Zekind did not submit payroll to the payroll processing company. Reed reduced and then stopped the contributions to her retirement account because there was not enough money. She also gave up her health insurance. Reed wrote the policies for PTH, which included internal audits every two years and external audits every three years. She identified two sets of minutes from board meetings where Zekind was directed to perform audits and explained they were not done.

¶ 21    Reed estimated she spent approximately $172,000 of her personal funds on PTH expenses but was not fully reimbursed. She did not always carry the PTH credit card and sometimes it would be at its limit so she would use her own credit card and pay herself back. About 100 clients lacked bank accounts so she would provide them cash payments. All her expenditures were documented and invoiced to the provincials. She explained various local expenditures. For example, she would

8

buy food locally for board and group meetings because the food and parking costs were cheaper at the local grocery store.

¶ 22    Reed reviewed her personal checking account and stated which payments were work-related. For example, a charge at the Ottawa Hallmark would be a gift for a board member and authorized. The charges at the dermatologist were for services she received as treatment for a work-related injury she suffered while in St. Louis for a conference. The provincials wanted to avoid a worker's compensation claim and offered to pay her related medical expenses. When she sought reimbursement, she would tell her administrative assistant the amount and provide a receipt which would then be put in the appropriate client file. Her assistant kept a running total of the amounts of personal funds Reed spent on PTH's behalf as did Reed.

¶ 23    She reviewed a number of exhibits and explained the expenses. One exhibit established that PTH's Bank of America account was based in California. Reed recounted that Bank of America opened a local PTH account on its own initiative, but it was temporary, and the PTH account remained housed in a California Bank of America location. She explained the various work-related charges in her personal checking account and reimbursements she received. Reed identified a number of exhibits consisting of emails she sent to Zekind about the financial issues and email responses from him about the lack of payments to the payroll and insurance companies. In one email, Reed told Zekind she had to open a second checking account because the Bank of America account remained frozen. Board minutes provided that Zekind was to provide a financial report.

¶ 24    Reed explained the billing procedure as follows. Each month, PTH sent two bills to each provincial. One bill was for Reed's time and the other bill was for all the disbursements and included an invoice and receipts. Some expenses PTH incurred on behalf of victims included

payment of doctor and therapy bills, and for food, toys, tuition, diapers or whatever the client needed. Reed wrote the policies for PTH, including standard operating procedures regarding financial statements and credit card usage. The financial statements policy required the creation of monthly financial statements, to be monitored and reviewed by the executive director, with quarterly statements sent to the treasurer and financial committee. The policy also provided that the statements would be maintained on the network. She followed the policy until Zekind informed her it was too much information and he lacked the time to review it. The credit card usage policy provided that its use was limited to budgeted items unless approved by the executive director. In the case of a "reimbursement situation," photocopied receipts were to be made. According to Reed, this policy was followed.

¶ 25        On cross-examination, Reed acknowledged she used the PTH credit card for her personal expenses and said it was "not not allowed." On redirect, she added that PTH had more money going out than coming in and that Zekind directed her to reimburse herself. Her assistant raised a red flag with her when Zekind told the assistant to write a check to his company for $23,000 for reimbursement. He did not provide an invoice. She explained the plane tickets and expenses at Disney World were for a trip that the provincials gifted her and her family as a bonus when they denied Reed's request to go on an international mission.

¶ 26        William Yacullo testified. He was the president of an executive search firm, in addition to volunteering on the PTH board of directors as a member and as president. Reed was entitled to reimbursement if she spent personal funds for PTH. He was not aware she spent her own funds on charity expenses but if that was the case, the charity "probably did reimburse her or should have." When the charity began in 2004, it had $226,976.12 in the bank. At the end of 2005, its account total was $154,958.55, and at the end of 2006, the balance was $51,553.80. Questions arose about

10

the finances and questionable disbursements only in the last few years of PTH's existence. Zekind determined the financial information to be shared with the board. Zekind was the sole financial committee member. He did not know whether there were receipts in the files to match Reed's expenditures. The board was not aware of the issue.

¶ 27 Father Bernard Bauerle, a Carmelite priest, testified. He was familiar with Reed since PTH's inception. They engaged in many conversations and travelled together. He received bills from PTH all the time with documentation for the agreed total. He knew beforehand on what the money was spent. Reed would always call if there was a change in the original plan of service for a victim. The Carmelites never had an issue with Reed's documentation of expenses or the bills she sent. He could not have been more satisfied with Reed and many victims affirmed her. On cross-examination, Bauerle said that at the board meetings, Zekind gave the financial reports. Reed never sought approval for personal expenses for personal use. He would have authorized Reed's use of Carmelite money on herself if he had known "what it was." For example, a second night at a hotel while traveling on PTH business would have been authorized, but he would not have approved the use of charity funds for personal use at local stores.

¶ 28 Father Paul Novak, of the Friar Servants of Mary, a/k/a Servites, testified. His procedure with Reed consisted of an initial phone call from her where they discussed the possible services for the victim and then Reed would send a bill with the expected expenses. He was unaware of who Zekind was. Zekind did not provide any written financial documents. On cross-examination, Novak said he did not authorize funds for Reed's personal expenses. On redirect, he further explained that the invoices Reed sent included documentation regarding the expenses. She was entitled to be reimbursed for personal expenditures on behalf of PTH. If Reed had been paying

11

PTH expenses from her personal funds, she "would need to be reimbursed" and "that should have been done."

¶ 29    Father Don Webber, a Passionist priest and Congregation of the Passion provincial from 2007-2015, testified. He was a PTH board member since 2007. There were always beverages and snacks at the board meetings. He did not receive any PTH bills because his order did not send any clients to the charity for services. He understood the treasurer was reviewing the books. Usually, Zekind gave a financial presentation at the board meetings.

¶ 30    The defense rested and the State recalled Zekind in rebuttal. He never saw the emails Reed sent to him about the financial issues, although they were sent to his email address. He gave quarterly reports to the board based on financial numbers provided by Reed or her assistant. He did not receive bank statements. Reed did not ask for reimbursement. He did not know she was using her personal account. He trusted her regarding the financial numbers. On cross-examination, he acknowledged he did not know if the PTH credit card had a limit, if there was money to pay salaries, and whether there was a second PTH checking account.

¶ 31    The trial court found Reed guilty on all four counts and entered judgment only on count IV, unauthorized control of between $100,000 and $500,000, finding it included the other three counts. Reed's posttrial motions were denied. The court sentenced her to a four-year term of probation and ordered her to perform 400 hours of community service and pay $102,270.78 in restitution. She timely appealed.

¶ 32                                    ANALYSIS

¶ 33    There are two issues on appeal: whether the trial court erred when it (1) denied Reed's motion for a directed verdict and (2) found Reed guilty of theft. Reed argues that the trial court erred in denying her motion for a directed verdict and in finding her guilty because the State failed

12

to present evidence that her financial acts were unauthorized. She maintains that the provincials individually directed her use of funds and the State's case is insufficient without evidence from them that Reed's expenditures were unauthorized.

¶ 34    A person commits theft when "she knowingly: (1) obtains or exerts unauthorized control over property of the owner; or (2) obtains by deception control over property of the owner" with the intent to "deprive the owner permanently of the use or benefit of the property." 720 ILCS 5/16-1(a)(1)(A), (2)(A) (West 2012). The unauthorized taking of property is an element of the offense of theft. *People v. Miller*, 24 Ill. App. 3d 504, 508 (1974). "Theft is the taking of property without the owner's consent." *People v. Sims*, 29 Ill. App. 3d 815, 817 (1975). When the theft is by an employee, whether it was unauthorized depends on the scope of the employee's authority. *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 219. Theft by deception involves the use of false representations to obtain money. *People v. Wurster*, 83 Ill. App. 3d 399, 403 (1980). When considering a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could find the State proved the essential elements of the offense beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 35    At the close of the State's case-in-chief or at the close of all the evidence, a defendant may move for a directed verdict of not guilty where she argues the State's evidence is insufficient to support a guilty verdict. 725 ILCS 5/115-4(k) (West 2018). When a defendant's motion for a directed verdict at the close of the State's case is denied and she presents evidence thereafter, she waives any error in the court's decision to deny the motion unless she renews the motion at the close of all the evidence. *People v. Connolly*, 322 Ill. App. 3d 905, 913 (2001). We review a trial

court's denial of a motion for a directed verdict *de novo*. *People v. Kelley*, 338 Ill. App. 3d 273, 277 (2003).

¶ 36   Reed sought a directed verdict at the close of the State's case, which the trial court denied. At the close of all the evidence, in accord with a plan between the court and the parties, the parties submitted written closing arguments. In her "memorandum in support of closing argument," Reed argued for a directed verdict. Under these circumstances, we find Reed renewed her motion for a directed verdict at the close of all the evidence. We further find that the trial court did not err when it denied Reed's motion. For purposes of the motion, the defendant admits the State's facts as true. *Id.* The court only considers the evidence most strongly in support of the State's case and must decide whether a reasonable person could find the defendant guilty beyond a reasonable doubt. *People v. Withers*, 87 Ill. 2d 224, 230 (1981). "[A] motion for a directed verdict of not guilty asks whether the State's evidence *could support* a verdict of guilty beyond a reasonable doubt, not whether the evidence *does in fact support* that verdict." (Emphases in original.) *Connelly*, 322 Ill. App. 3d at 915.

¶ 37   The State's evidence could support a guilty verdict beyond a reasonable doubt. The indictment alleged Reed committed theft by deception by writing checks from the account of PTH "without authority" (counts I, II, III) (720 ILCS 5/16-1(a)(2) (West 2012)) and theft by unauthorized control over more than $100,000 and less than $500,000 of money belonging to PTH (count IV) (720 ILCS 5/16-1(a)(1)(A) (West 2012)). The State's case-in-chief established PTH was started with seed money of $25,000 from each of the provincials ($325,000), which was placed into the PTH Bank of America checking account. The charity was overseen by two boards: the board of trustees which consisted of the major superiors of the various orders, and the board of directors. Reed handled the charity's day-to-day operations. Zekind was to oversee financial

14

statements and report to the boards. Zekind gave reports based on information from Reed. The numbers seemed reasonable. Zekind became aware of financial issues, thought there should be sufficient money, spoke to Reed, who said she would take care of it and he believed she did. Zekind at some point discovered there was a second PTH checking account that was not authorized. Zekind was unaware of the financial issues until 2009. The board minutes indicated audits were ordered, but they were never done. According to Zekind, Reed was without authority "to his knowledge" to pay personal expenses from the PTH accounts. Wasylyszyn based her investigation and conclusion of criminal activity solely on her discussions with Zekind. His opinion that the expenditures were unauthorized could lead a reasonable person to find Reed guilty. Viewing the evidence in a light most favorable to the State, we consider it could be possible to find Reed guilty beyond a reasonable doubt. The trial court did not err when it denied Reed's motion for a directed verdict at the close of the State's case.

¶ 38    We now consider whether the trial court erred when it found Reed guilty of theft. Reed argues the State failed to prove beyond a reasonable doubt that she obtained PTH funds for her personal use without authority or by deception. She submits the State's evidence was insufficient to show that her use of charity funds was not authorized.

¶ 39    Count I alleged Reed committed theft of $908.48 with a check to Nicor for her home utility bill. Counts II and III alleged theft by deception with two checks written on the PTH account to Reed for $8898.86 and $2065. Count IV alleged that Reed exercised unauthorized control over between $100,000 and $500,000 of PTH property. The trial court found Reed guilty of all four counts but only entered judgment on count IV, finding it incorporated counts I, II and III. In reaching its determination, the court rejected that the State provided adequate proof of the entirety of its claim of $348,146.80 against Reed but found it had established theft of $102,270.78,

15

consisting of $86,946.45 in cash advances on the PTH credit card and $15,324.33 in PTH checks written for Reed's personal expenses.

¶ 40    The State presented the cash advances with its exhibit No. 8, a spreadsheet summary indicating PTH credit card purchases and cash advances. The PTH checks included in the $102,270.78 total were submitted in State's exhibit No. 4. That exhibit did not include checks number 1030 and 1010, which formed the basis of counts II and III. In its ruling the trial judge found that the State had not provided sufficient evidence of theft for any expenditures other than those included in the $102,270.78 and therefore we find the convictions on counts II and III must be reversed.

¶ 41    We turn now to the sufficiency of the proof to sustain the convictions on counts I and IV. The allegation in count I was based on PTH check number 11391 for $908.48 written to Nicor. This check was included in the $102,270.78 amount the court found was supported by the evidence. An account number in the memo line of the check corresponded with Reed's personal Nicor account. While apparent that the check was written for Reed's personal expenses, it is not apparent that Reed intended to use the funds without authority. Similarly, the cash advances and other PTH checks used to pay Reed's utility bills included in exhibit No. 4 established only that she used the PTH credit card for cash advances and its checking account to pay her own utilities from time to time. The evidence does not indicate lack of authority.

¶ 42    Zekind testified that he believed Reed lacked authority to use PTH funds as alleged. However, despite his responsibility as the charity's treasurer, Zekind lacked knowledge about how Reed handled the charity's finances. He did not know how PTH's bills were paid prior to him opening its checking account several months after it started operations. He did not receive the charity's bank statements or review them. He did not examine the files where Reed said she

16

documented her expenses. He was not privy to the client files. He did not know there was a practice of reimbursement. Significantly, he was not aware of the practices and procedures Reed developed with the provincials, who approved her expenditures as invoiced. Further, Zekind never testified that he had been given any authority by the provincials to make policies about authorized expenditures on behalf of the charity. Testimony from the priests affiliated with the member orders established that there were never unexpected expenses on the monthly statements, and they had no issues with Reed's operation of the charity. Zekind, Yacullo, and Novak all agreed Reed was entitled to reimbursement if she used her personal funds for PTH expenses.

¶ 43　　Wasylyszyn relied on Zekind's characterization of the expenses. Zekind's testimony described a situation where Reed was left unsupervised to handle PTH as she found fit. Nevertheless, Zekind testified that Reed would not have been authorized to use the charity's checking account for personal expenses or its credit card for cash advances. He admittedly, however, did not know the reimbursement policy or what use of the credit card the provincials authorized. Reed gave reasonable explanations for the use of cash advances such as payments to clients who lacked bank accounts and the need for tolls and incidentals while traveling. Reed addressed various expenditures on the stand, recalling the services provided to clients, such as rent and tuition payments, counseling, and vacations.

¶ 44　　According to Reed, all the payments were documented and invoiced to the provincials. The files, however, were missing or incomplete. The State faulted Reed for the condition of the files but her testimony established the regular procedure for each file and what should have been in them. While there were approximately 150 files available for trial, Reed testified PTH served more than 300 clients. In addition, Reed encountered discovery difficulties throughout the case, and the

17

State, apparently subject to the charity's insurance company which held the files, turned over an additional 9000 pages of documents after it had claimed discovery was already complete.

¶ 45        Zekind's testimony established that he was uninvolved in the day-to-day operations of PTH and had no specific knowledge whether Reed was able to reimburse herself as she did with the checks to Nicor and for other personal expenses and to use the PTH credit card for cash advances. Zekind relied on information that was "in his knowledge." His role as treasurer was to oversee the financial statements and give reports to the board. There is no indication his authority extended to a supervisory role over Reed or that he was directed by the provincials to supervise her. He admitted he was unaware of Reed's procedures with the provincials. Importantly, he said he did not know whether they authorized her use of the checking account and credit card to reimburse herself. The charity's standard operating procedure for credit card usage provided that "unless approved by the executive director," the card could be used only for budgeted expenses. The policy further provided that photocopied receipts would be used in the event of "a reimbursement situation." Thus, PTH's policies required approval only from Reed as to credit card purchases and reflected that reimbursements were to occur. Zekind, as treasurer, was not in a position to authorize Reed's expenditures. For the State to meet its burden, it had to present a witness who established the policy on how PTH funds were to be spent and established that Reed's use of funds was unauthorized. The priests who testified did not say she spent any funds without authority. Bauerle said that although Reed never sought authorization for personal expenses, he would have authorized the use of funds if he was aware of the expenditure. The State did not present any evidence from a person in authority that Reed's use of PTH funds was unauthorized. Zekind's knowledge amounted only to an assumption, as he admitted, and cannot sustain the theft charges.

18

We find the evidence was insufficient to sustain any of the counts of which Reed was convicted and reverse her conviction.

¶ 46                                              CONCLUSION

¶ 47          For the foregoing reasons, the judgment of the circuit court of La Salle County is reversed.

¶ 48          Reversed.