**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240316-U

Order filed July 11, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0316 Circuit No. 22-CF-258 |
| JOSE D. VAZQUEZ, | ) ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Brennan and Justice Bertani concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The evidence presented at trial was insufficient to establish that defendant digitally penetrated the victim as alleged in counts I and V. We therefore reverse those convictions for predatory criminal sexual assault of a child outright. Defendant's convictions on counts II and IV are affirmed.

¶ 2    Defendant, Jose D. Vazquez, appeals from his convictions for predatory criminal sexual assault of a child, arguing that the evidence was insufficient to sustain his convictions on the four challenged counts. Further, defendant contends that reversible plain error occurred when the Kankakee County circuit court provided an incorrect instruction regarding the definition of

sexual penetration to the jury as it relates to digital penetration. We affirm in part and reverse in part.

¶ 3                                            I. BACKGROUND

¶ 4          On May 31, 2022, defendant was charged with five counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)), and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). Relevant to this appeal, the charges alleged that defendant committed an act of sexual penetration with H.L., in that (1) on May 10, 2022, defendant "placed his finger in her vagina" (count I); (2) on May 10, 2022, defendant "placed his tongue and mouth on her vagina" (count II); (3) between May 12, 2018, and May 10, 2022, defendant "placed his tongue in her vagina" (count IV); and (4) between May 12, 2018, and May 10, 2022, defendant "placed his finger in her vagina" (count V).

¶ 5          The case proceeded to a jury trial on December 11, 2023. H.L. testified that she was born on May 12, 2011. H.L. was 12 years old at the time of trial. On May 10, 2022, she lived in a residence with her stepfather, defendant; her mother, Itzaura Mendez; and her two siblings. That night, H.L. fell asleep in the living room. She was awakened when defendant inserted his penis into her buttocks. Defendant stopped momentarily to "check" on Mendez who was asleep in her bedroom. Upon his return, defendant inserted his penis into both H.L.'s buttocks and vagina.[1] He also touched her buttocks and chest with his hands and kissed her on the lips. H.L. testified that defendant did not place his finger or tongue inside her vagina. She stated that defendant stopped when Mendez entered the living room and began yelling. Mendez "quickly grabbed [her]" and

_____

[1] H.L. refers to defendant's penis as his "private part" and her vagina as her "front area." Later in her testimony, she clarifies that his private part was called a penis and her front area was called a vagina.

sent H.L. to her bedroom. H.L. told Mendez that defendant was "putting his private part on [her] body," and Mendez called the police.

¶ 6    H.L. testified that defendant had engaged in similar conduct prior to the May 10, 2022, incident. She could not remember how old she was when the first incident occurred. H.L. described the first encounter she remembered. Defendant had called H.L. into his bedroom and placed his penis in her vagina. She stated that it felt "ugly and bad." H.L. testified that no other body parts were involved on that occasion. She testified that this conduct occurred "[a]ll the time." H.L. then described another incident which occurred "[a] long time ago" in an upstairs closet and involved defendant placing his penis in her vagina and buttocks. Mendez knocked on the door, and H.L. pulled her clothing up before Mendez entered. H.L. stated that defendant did not touch her with his hands.

¶ 7    H.L. further testified that defendant previously touched her vagina with his tongue as well as his penis, stating that he touched her "[e]very other day." H.L. explained that defendant had not touched her vagina with anything other than his penis or tongue and denied that he used his tongue on May 10, 2022.

¶ 8    A day or two after the May 10, 2022, incident, H.L. spoke with a nurse at the hospital. H.L. agreed to a blood test and a mouth swab but would not let hospital personnel perform any further testing because she was scared. H.L. told the nurse that defendant "did not put his finger in [her] butt" and that he "put his penis on [her] vagina and that was it."

¶ 9    Mendez testified that on May 10, 2022, she was married to defendant. That night, the children decided to have a "pajama party in the living room." When Mendez put the children to bed, H.L. was lying on the sofa bed. She and defendant entered their bedroom. Mendez was recovering from surgery and took pain medication which caused her to fall asleep. After some

3

time, Mendez awoke in pain. She did not see defendant in their bedroom. Mendez went to check on the children. She observed defendant lying under the sheets next to H.L. He was kissing H.L. on the neck. Mendez saw what appeared to be defendant's hand moving in a circular motion under the sheets. Mendez indicated that the movement occurred in the area of H.L.'s vagina but acknowledged that because the movements occurred underneath the sheets, she could not see exactly what was happening. Defendant told Mendez that H.L. wanted to watch something on his phone. When defendant stood, Mendez noticed his penis was erect. Mendez took H.L. to a different room, and H.L. told her that defendant was lying about the phone and that he had been kissing her neck and touching her vagina. Mendez called the police, and defendant was ultimately arrested.

¶ 10 Mendez testified that a week or two prior to the May 10, 2022, incident, she found H.L. in her bedroom closet with defendant. Defendant explained to Mendez that he was helping H.L. with an art project, but H.L. told Mendez that defendant was lying and had been kissing her.

¶ 11 Mendez took H.L. to the Children's Advocacy Center (CAC) on May 11, 2022, where she was interviewed. The next day, H.L. underwent a medical examination at Riverside Hospital. Mendez testified that, while H.L. was at the hospital, she felt ashamed. She did not want Mendez in the room with her. She refused to remove her clothing and refused a vaginal examination. Mendez attempted to comfort H.L. and explained that the hospital staff wanted to "make sure everything [was] fine." Mendez testified that H.L. persisted in her refusal and "shut down every time that [they] tr[ied] to sp[eak] with her."

¶ 12 Emergency room nurse Diane Clatterbuck testified that she had been employed at the hospital for 40 years—13 years in the emergency room and 27 years in the pediatric unit. Clatterbuck was in training to become a sexual assault nurse examiner but had not yet been

4

certified. On May 12, 2022, she examined H.L. Mendez was in the room with H.L. initially but stepped out when asked to by H.L. Clatterbuck stated that H.L. was quiet and withdrawn but initially cooperative.

¶ 13        Clatterbuck testified that H.L. would not make eye contact when being interviewed about the incident. When Mendez was not in the room, H.L. told Clatterbuck that Mendez walked into the living room when defendant was kissing her abdomen. Later, after Mendez returned, H.L. disclosed that defendant touched her "with his hands and with his private parts." H.L. further disclosed that defendant placed his penis inside her and attempted to place his penis in her mouth, but she avoided it. H.L. stated that defendant had been "putting his private parts inside [her] since [she] was seven or eight years of age." Clatterbuck explained that H.L. did not elaborate any further. Clatterbuck testified that H.L. told her that defendant had penetrated her vagina with his penis and had "kissed, licked, sucked, or bitten" her mouth and body, but she denied that any other contact with her vagina occurred.

¶ 14        Clatterbuck called for the doctor to perform the genital examination and collection. When the male doctor entered the room, H.L.'s demeanor changed, and she curled up. She became frightened and tearful and repeatedly indicated that she was not comfortable. Despite attempts to comfort and persuade her, H.L. ultimately declined to submit to the genital examination.

¶ 15        Samantha Woodmaster testified that in May 2022, she was the CAC program director as well as a forensic interviewer. On May 11, 2022, Woodmaster interviewed H.L. A video recording of the interview was then admitted and published to the jury.

¶ 16        During the interview, H.L. was forthcoming and cooperative, maintaining eye contact with Woodmaster. H.L. stated that on May 10, 2022, she had been asleep on the living room couch when defendant began touching her. She specified that the touching was kisses on the

5

mouth. Defendant then pulled her pants down. He kept touching and kissing her. He touched her private parts, which she described as the part where she "goes to the bathroom" and her chest. Defendant kissed her everywhere. H.L. stated that defendant touched and kissed her both inside and outside her body. She testified that he went under the blanket and kissed her private part. Defendant repeatedly went to Mendez's bedroom, then returned and continued. After the fourth time, Mendez exited the bedroom and saw defendant with H.L. H.L. stated that defendant lied to Mendez when he told her that H.L. was using his phone. She further reiterated that the first thing defendant touched during the May 10, 2022, encounter was her private part, which she specified meant that he inserted his penis into her vagina and then began touching her chest and mouth. She explained that he kissed her neck, vagina, and lips and that his tongue went inside her vagina. H.L. stated that defendant tried to insert his penis into her mouth, but she moved to avoid it. She indicated that no other body parts were involved in the May 10, 2022, incident.

¶ 17      When asked about prior incidents, H.L. stated that the conduct started when she was seven or eight years old. The conduct occurred almost "[e]very other day," generally at night when Mendez was away from the residence. H.L. detailed the locations in which such conduct occurred. The first time that H.L. could recall, she was asleep and woken up by defendant touching her. She specified that there was no kissing involved the first time and that, when she referred to touching, she meant that defendant placed his penis inside her. She testified that it was very painful. After each incident, defendant promised it would not happen again, but he never kept his promise.

¶ 18      As the interview continued, H.L. stated that defendant's conduct was similar each time. She indicated that when it began, defendant only touched her. The incidents continued, and he

6

began kissing her and touching her everywhere on her body. Sometimes, he kissed her vagina. H.L. stated that the conduct involved both her vagina and buttocks.

¶ 19 The jury found defendant guilty on all counts. Defendant was sentenced to consecutive terms of six years' imprisonment on each of the five counts of predatory criminal sexual assault of a child, which were to run consecutive to two concurrent terms of three years' imprisonment on the aggravated criminal sexual abuse counts. Defendant appealed.

¶ 20                                                    II. ANALYSIS

¶ 21 On appeal, defendant challenges the sufficiency of the evidence presented regarding (1) the use of his fingers as alleged in counts I and V, and (2) oral contact with his mouth or tongue as alleged in counts II and IV. He does not challenge the remaining charges. Defendant also argues that the court committed reversible plain error when it provided the incorrect definition of sexual penetration used for the allegations of digital penetration. We begin by addressing the sufficiency of the evidence.

¶ 22 We review challenges to the sufficiency of the evidence to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In making this determination, we review the evidence in the light most favorable to the State. *People v. Hardman*, 2017 IL 121453, ¶ 37. It is not the function of the reviewing court to retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The trier of fact must "resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 23 Under the *Collins* standard, it is well-settled that all reasonable inferences in favor of the State are allowed but unreasonable or speculative inferences are not permissible. *People v.*

*Cunningham*, 212 Ill. 2d 274, 280 (2004). Thus, "if only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *Id.*

¶ 24    As charged in this case, "[a] person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, *** commits *** an act of sexual penetration, and *** the victim is under 13 years of age ***." 720 ILCS 5/11-1.40(a)(1) (West 2022). In this case, we must determine whether the State presented sufficient evidence to prove that "an act of sexual penetration" (*id.*) occurred as charged in each contested count. For digital penetration as alleged in counts I and V, sexual penetration means "any intrusion, however slight, of any part of the body of one person *** into the sex organ *** of another person." 720 ILCS 5/11-0.1 (West 2022); see *People v. Maggette*, 195 Ill. 2d 336, 349 (2001). Regarding oral contact as alleged in counts II and IV, sexual penetration means "any contact, however slight, between the sex organ *** of one person and *** the *** mouth *** of another person." 720 ILCS 5/11-0.1 (West 2022).

¶ 25                                    A. Digital Penetration

¶ 26    First, the State failed to provide sufficient evidence of digital penetration to support a conviction for predatory criminal sexual assault as alleged in count I. At trial, H.L. testified that defendant did not touch her vagina with his fingers on May 10, 2022. The testimony of both H.L. and Clatterbuck established that H.L. denied that defendant touched H.L.'s vagina with his fingers on May 10, 2022, when interviewed at the hospital. Further, during the CAC interview, H.L. indicated that on May 10, 2022, defendant inserted his penis and tongue into her vagina and denied that he used any other body part. While Mendez testified that she observed defendant moving his hand around the area of H.L.'s vagina and that H.L. told her that defendant had been touching her vagina, Mendez admitted that the movement was obscured by a sheet. Moreover,

H.L. did not elaborate on how defendant touched her vagina or what he touched her with. Accordingly, there was no evidence elicited that would support a finding that defendant's finger intruded, however slight, into H.L.'s vagina on May 10, 2022.

¶ 27        Second, the State failed to prove sexual penetration based on digital penetration as alleged in count V. The dates in count V stretch from May 12, 2018, to May 10, 2022. H.L.'s statements to both Clatterbuck and Woodmaster that (1) defendant began touching her when she was seven or eight, (2) the conduct happened frequently—almost every other day, and (3) continued from ages seven or eight until May 10, 2022, provide sufficient evidence that criminal sexual conduct occurred between May 2018 and May 2022. However, like count I, the evidence elicited is insufficient to support a finding that defendant digitally penetrated H.L.'s vagina during this four-year period. At trial, while discussing prior incidents with defendant, H.L. testified that defendant had not touched her vagina with anything other than his penis or tongue. H.L. did mention that defendant touched her, both inside and outside her body, several times throughout her CAC interview. However, every time she mentioned "touching," H.L. described that term as involving defendant's penis or tongue. She never mentioned that defendant placed a finger inside her. Further, H.L.'s additional references to unspecified touching do not contain any descriptions that would allow a reasonable inference that defendant penetrated her vagina or buttocks with his finger. Drawing such an inference would be too speculative based on the evidence presented.[2]

¶ 28                              B. Oral Contact

_____

[2] In reaching this conclusion, we emphasize that the State did not charge defendant with predatory criminal sexual assault of a child under the alternative theory of contact between defendant's finger and H.L.'s vagina for the purposes of sexual gratification or arousal.

9

¶ 29    Although the State failed to prove the allegations in counts I and V, there was sufficient evidence of oral contact to prove defendant guilty of predatory sexual assault as alleged in count II. During her CAC interview, H.L. told Woodmaster that defendant went underneath the sheets and kissed her vagina. She further stated that defendant kissed her both inside and outside her body and placed his tongue inside her vagina. While she denied this conduct happened at trial a year and a half after the incident, the CAC interview—which was conducted one day after the May 10, 2022, incident—was published to the jury. Because the events were fresh in her mind during the interview, the jury was free to consider that evidence more reliable. See *People v. Lara*, 2011 IL App (4th) 080983-B, ¶ 58; see also *People v. Bowen*, 183 Ill. 2d 103, 115-16 (statements made closer in time to the alleged abuse will tend to be considered more reliable on the grounds that the events are fresher in the child's mind).

¶ 30    Defendant argues that no reasonable trier of fact could find the CAC interview more credible because, in addition to her denial at trial, H.L. also told Clatterbuck, who had some training as a sexual assault nurse examiner and years of experience with pediatric patients, that defendant had not touched her vagina with his tongue. However, the jury also heard evidence that while being interviewed at the hospital (1) H.L. was ashamed and scared, (2) she was quiet and minimally responsive, (3) she did not elaborate on the answers that she gave to Clatterbuck, and (4) she "shut down" when the hospital staff attempted to speak with her. In contrast, the jury observed H.L.'s forthcoming and calm demeanor during the CAC interview in which she was cooperative and responsive to Woodmaster. As such, we cannot say that it would be unreasonable for a jury to infer that the information H.L. provided during the interview was more credible.

10

¶ 31 Finally, the evidence was sufficient to prove defendant guilty as to count IV. As previously discussed, the evidence established that defendant committed acts of sexual penetration against H.L. between May 12, 2018, and May 10, 2022. At trial, H.L. testified that defendant touched her vagina with his tongue every other day for nearly four years. During the CAC interview, H.L. told Woodmaster that defendant kissed her vagina when he touched her. Based on this evidence, a reasonable trier of fact could find that defendant's tongue made contact with H.L.'s vagina during the alleged timeframe.

¶ 32 For the foregoing reasons, we reverse defendant's convictions on counts I and V outright but otherwise affirm his convictions. Because we reverse defendant's convictions on counts I and V, we need not reach defendant's remaining argument regarding erroneous jury instructions for those counts.

¶ 33 III. CONCLUSION

¶ 34 The judgment of the circuit court of Kankakee County is affirmed in part and reversed in part.

¶ 35 Affirmed in part and reversed in part.