Docket No. 81491–Agenda 4–May 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 STEVEN SMITH, Appellant.

Opinion filed February 19, 1999.

JUSTICE HEIPLE delivered the opinion of the court:

In 1986, following a jury trial in the circuit court of Cook County, defendant, Steven Smith, was convicted of the murder of Virdeen Willis, Jr., and was thereafter sentenced to death. On direct appeal to this court, we reversed defendant’s conviction based upon certain evidentiary errors, and remanded to the circuit court for a new trial. 
People v. Smith
, 141 Ill. 2d 40 (1990). On remand in 1996, defendant was again convicted of murder and sentenced to death. He now appeals that conviction and sentence.

Defendant raises 19 separate issues concerning both the trial and sentencing proceedings below, including his argument that the State failed to prove his guilt beyond a reasonable doubt. Because we agree that the evidence adduced at trial was insufficient to sustain the jury’s verdict, we now reverse. Accordingly, we do not reach the remaining issues.

FACTS

On the evening of June 30, 1985, the victim, Virdeen Willis, Jr., his friend Robin Howland, and his cousin Maggie Burnett drove to the Shamrock Lounge, a bar owned by Burnett. Willis parked his car in a vacant lot next to the lounge, and the three went inside.

Hasan Ali was tending bar at the Shamrock Lounge that evening. Burnett introduced Ali to Willis and Howland, who took seats at the end of the bar. Ali noticed three African American men enter the lounge and sit at a table behind Willis and Howland. He later identified the men as defendant, Herbert Stevens, and Robert Spade. Ali explained at trial that he got a very good look at the three men because when he saw them, he was concerned that they were going to rob the bar. According to Ali, defendant, Stevens, and Spade were all wearing dark clothing. Defendant was wearing a black leather jacket and a black leather cap. Herbert Stevens, like defendant, was also dressed all in black, while Robert Spade was wearing army fatigues.

At some point in the evening, Ronda Caraway entered the Shamrock Lounge and walked up to the table at which defendant, Stevens, and Spade were seated. (At trial, Ronda stated that Stevens was her boyfriend.) Like Ali, Ronda testified that defendant and Stevens were dressed all in black, while Spade was wearing army fatigues. She also testified, like Ali, that defendant wore a black leather cap.

Ronda spoke to one of the men, who then got up and left the lounge with her. (The testimony is unclear whether the man who left with Ronda was defendant or one of the other two men.) The man then returned to the lounge and rejoined his companions. Thereafter, Ronda went to the home of a friend who lived in an upstairs apartment located across the vacant lot from the lounge. Ali testified that after the man who left with Ronda returned, defendant, Stevens, and Spade sat in the lounge for a while, and then got up and exited together.

Approximately four or five minutes later, Willis got up and left the bar with Howland and Burnett. Howland testified that while exiting the lounge, she was in front, followed by Willis and then Burnett. Once outside, Howland “hung back” a step in order to allow Willis and Burnett to continue their conversation as the three walked towards Willis’ car. Howland did not notice anyone else on the street when she, Willis, and Burnett left the bar.

As they reached the car, Willis was standing immediately next to Burnett, and Howland was standing three or four feet behind them. As Howland turned her head back towards the bar, she saw a shadowy figure with a gun in his hand walk past her at a distance of two to three feet. Next, she heard a pop and saw a puff of smoke. Looking back towards the gunman, Howland saw that he was standing between two and four feet away from Willis and Burnett.

Howland then saw the gunman crouch down over Willis, who was lying on the ground. At this point, the gunman was facing Willis and Burnett, with his back to Howland and to the street. Howland ran back to the bar to get help. When she returned to Willis, he was lying on the ground and was unresponsive. Howland noticed that Willis was bleeding and appeared to have been shot in the neck.

Howland described the gunman as wearing black clothing and a black hat. Howland could not say, however, whether the gunman was wearing a sports coat, a sweatshirt, or a leather jacket, nor could she state whether his hat was a cap or some other style. Howland testified that it was too dark to make out further details, and that she never saw the gunman’s face.

Paramedics from the Chicago fire department arrived at the scene of the shooting shortly before 10 p.m. A paramedic testified that when he arrived on the scene, Willis was lying motionless in the vacant lot with an apparent gunshot wound to the neck. He had no pulse and was not breathing. The paramedics took Willis to a hospital where he was pronounced dead. An autopsy revealed that Willis died of a gunshot wound that entered the upper left area of his neck and lodged in his spine.

Ronda Caraway testified that at the time of the shooting she had fallen asleep at her girlfriend’s apartment overlooking the vacant lot. After she was awakened by her girlfriend, Ronda went out on the fire escape and saw an ambulance and some people gathered in the lot next to the Shamrock. A few hours later, police came to the apartment where Ronda was staying. After speaking with Ronda, the police brought her to the police station during the early morning hours of July 1. Ronda remained at the police station all that day, and over the next night. Sometime on July 2, the police showed Ronda several pictures, including those of defendant; Robert Spade; and her boyfriend, Herbert Stevens. Ronda identified photos of the three men.

In the days immediately after the shooting, Debrah Caraway, Ronda’s sister, heard that Ronda was being questioned by police, and Debrah went to various police stations to look for her. On July 2, Debrah finally found her sister at the 51st Street police station. While at the station, Debrah told police that she had witnessed the shooting and that defendant was the man who shot Willis. The police then showed her a photo line-up, and Debrah identified defendant as the gunman.

Also on July 2, Robin Howland was shown a group of photographs, including one of defendant, by Chicago police detectives. At that time, Howland stated that she did not recognize any of the men in the photographs. At no time did Howland identify defendant as the gunman.

Willis’ cousin Burnett, who was standing next to Willis when he was shot, was also shown a group of photographs, including one of defendant. However, Burnett was unable to identify defendant as the man who had shot her cousin. Although present in the courtroom during the testimony of Howland, Burnett did not testify at trial.

Based upon Debrah’s identification, defendant was arrested on July 4. Defendant consented to a search of his apartment, where police recovered two black hats, two black jackets, a pair of black pants, and a pair of black shoes. Hasan Ali identified one of the jackets and one of the hats as items worn by defendant on the night of the shooting.

 Testimony of Debrah Caraway

At trial, Debrah Caraway testified that she and a man named Pervis “Pepper” Bell drove to the Shamrock Lounge on the evening of June 30, 1985, and parked across the street. Debrah testified that she had asked Pepper for a ride to the Bucket of Blood, a bar near the Shamrock, in order to look for her sister Ronda.

Debrah denied that she was looking for Ronda so that the two of them could go out and get cocaine. Debrah admitted, however, that she was using cocaine around the day of the shooting, but denied that she used it every day. Debrah testified that she was looking for Ronda so that the two of them could go to a bar called the Paradise Club to “hang out.”

On cross-examination, Debrah testified that she could not recall telling defense investigator Mary Waller that:

“The night of the shooting, when I asked Pepper for a ride, I was going to the Paradise to drink with my sister and to smoke some cocaine, if my sister had some or someone would give us some. I smoked cocaine everyday at that time.”

When confronted with the written statement given to Waller, Debrah admitted that the document contained the statement read by defense counsel. She further admitted that she had made the statement and had signed the document. However, Debrah testified that “it wasn’t meant like that,” and explained that her budget did not allow her to use cocaine everyday.

After Pepper and Debrah parked across the street from the Shamrock Lounge, Pepper got out of the car, but Debrah did not. Debrah testified that she had decided to remain in the car for a while. When Debrah did exit the car, she stepped in some water. According to Debrah, she paused to wipe the water off of her shoes, because she had just polished them.

While she was attending to her shoes, Debrah looked across the street into the vacant lot next to the Shamrock Lounge. There, she observed a man exit the lounge, light a cigarette, and walk into the lot. To the best of Debrah’s recollection, the man was alone when he exited the bar. A few seconds later, she saw another man, whom she had known for 2½ years and whom she recognized as defendant, exit the lounge from the same door as the first man. Defendant had a gun in his hand. Defendant then walked up to the first man and shot him. Debrah testified that the defendant, the victim, and she were the only ones on the street at that time. She testified that after the shot, defendant turned and looked both ways while moving his hand back and forth. She further stated that at one point after the shooting, defendant was facing in her direction, toward the street.

Debrah denied telling defense investigator Waller that: “At this time, I ran across the street to the Bucket of Blood. At this time, I still saw no one else on the street or in the parking lot.” Confronted with her signed written statement, Debrah maintained, “I don’t think I told her that. I don’t think that’s what I said.” Pressed by defense counsel, Debrah admitted that she signed the statement, but added, “[B]ut that don’t make her being understood what I said.” When asked whether Debrah had read the document over with the investigator, and whether the investigator had also read it to her, Debrah stated, “I think so, but I was sleep when yaw came [
sic
].”

Debrah further testified that she then went into the Bucket of Blood to look for her sister. Not finding her, she rejoined Pepper back out on the street and left with him to go to another bar, the Paradise Club, to look for her sister. Again not finding her, Debrah had a few drinks and left. Debrah did not speak to the police that night.

During the time that Ronda was at the police station, Debrah heard that the police were questioning her sister. Debrah then went to several different police stations looking for Ronda, but was unable to locate her. Debrah testified that she had heard that the police were trying to implicate Ronda in something she had seen, and Debrah believed that the police had confused Ronda with herself.

When Debrah found her sister, Ronda was crying and told her that the police were trying to say that she brought the gun to the shooting. At trial, Debrah denied telling investigator Waller that Ronda had told her that police would not let her use the bathroom, or that the police would not give her anything to eat. Debrah also denied telling Waller that the police had been harassing Ronda and that the police were holding Ronda against her will.

Debrah also denied having seen Pepper at the police station. However, when confronted with her earlier signed statement, Debrah admitted that she probably did tell Waller that she had seen Pepper at the station. Questioned further, Debrah admitted that Pepper was at the station, and that he was in handcuffs at the time, but stated that she could not recall seeing Pepper bloody or with a swollen eye. Debrah admitted, however, that she had read and signed a statement which indicated that Pepper was in a room at the police station, handcuffed and bleeding from the mouth.

 The Defense’s Case

Mary Waller, an investigator for the Cook County public defender’s office, was the sole witness for the defense. Waller testified that on October 26, 1995 (about five months prior to the second trial), she conducted an interview of Debrah Caraway. During the interview, Debrah told Waller that on the night of the shooting, she had been going to the Paradise Club to drink with Ronda and smoke some crack cocaine. She also said that around the time of the shooting, she smoked cocaine every day.

Debrah told Waller that the police had been harassing Ronda and accusing her of having been involved with the murder. Debrah said that the police had held Ronda her against her will, and tried to make Ronda say something about her role in the shooting. According to Debrah, Ronda had told her that the police would not give her anything to eat and would not allow her to use the washroom. Debrah also told the investigator that she had seen Pepper at the station, handcuffed, that he was bleeding from the mouth, and that his eye was swollen.

ANALYSIS

When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, this court will not retry the defendant. 
People v. Wittenmyer
, 151 Ill. 2d 175, 191 (1992). Rather, in such cases the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
People v. Young
, 128 Ill. 2d 1, 49 (1989), citing 
Jackson v. Virginia
, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). Thus, it is our duty in the case at bar to carefully examine the evidence while giving due consideration to the fact that the court and jury saw and heard the witnesses. 
People v. Bartall
, 98 Ill. 2d 294, 306 (1983); 
People v. Jefferson
, 24 Ill. 2d 398, 402 (1962); 
People v. Bartley
, 25 Ill. 2d 175 (1962); 
People v. Young
, 128 Ill. 2d 1 (1989). If, however, after such consideration we are of the opinion that the evidence is insufficient to establish the defendant’s guilt beyond a reasonable doubt, we must reverse the conviction. 
Bartall
, 98 Ill. 2d at 306; 
Jefferson
, 24 Ill. 2d at 402; 
Bartley
, 25 Ill. 2d 175; 
Young
, 128 Ill. 2d 1. The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict. 
People v. May
, 46 Ill. 2d 120 (1970); 
People v. Morehead
, 45 Ill. 2d 326 (1970); 
People v. Hampton
, 44 Ill. 2d 41 (1969); 
People v. Glover
, 49 Ill. 2d 78, 84-

85 (1971). While credibility of a witness is within the province of the trier of fact, and the finding of the jury on such matters is entitled to great weight, the jury’s determination is not conclusive. Rather, we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant’s guilt. 
People v. Smith
, 141 Ill. 2d 40, 55 (1990); 
People v. Pellegrino
, 30 Ill. 2d 331 (1964); 
Glover
, 49 Ill. 2d at 84-85.

The State’s case against defendant hinges upon the testimony of one witness, Debrah Caraway. Although two other witnesses placed defendant in the Shamrock Lounge on the night of the murder, only Debrah Caraway directly linked defendant to the crime. Neither Howland nor Burnett, both of whom were within feet of the gunman when he shot Willis, ever identified defendant.

Defendant argues that Debrah’s testimony was contradicted in important respects by the testimony of the State’s more reliable witnesses and was in other respects sufficiently impeached so as to severely undermine its credibility. Defendant contends that the weakness of the State’s chief witness, along with the lack of other direct evidence linking defendant to the crime, required a not guilty verdict as a matter of law. We agree.

The most glaring deficiency in the evidence involves Debrah’s account of how the shooting occurred. Both Ali and Howland testified that Willis, Howland, and Burnett left the bar 
together
. Moreover, Howland testified that she and Burnett accompanied Willis to the parking lot and were standing near him when he was shot. Nevertheless, Debrah claimed that Willis came out of the bar 
alone
, and was 
alone
 when he was shot.

Although the State argues that Debrah’s testimony was merely equivocal on this point, and thus did not directly conflict with the testimony of Ali and Howland, we find this argument unconvincing. The record is clear that despite some initial uncertainty, Debrah later confirmed that at the time of the shooting, “There wasn’t anybody else that I saw.” After describing the shooting, Debrah was asked again whether “it was just those two people there in the lot, is that correct, the man with the gun and the man with the cigarette?” Debrah answered, “Right.” Asked whether there was a lady standing next to the gunman when he allegedly waved the gun back and forth, Debrah answered “Not that I can recall.”

A second important inconsistency exists between the testimony of Debrah and the testimony of the bartender, Hasan Ali. According to Debrah, a few seconds after Willis exited the bar, defendant came out of the same door, walked up to Willis and shot him. Debrah twice confirmed that the gunman came out of the same door as Willis. In contrast, Ali testified that defendant and his companions had already left the bar together four or five minutes 
before
 the victim exited the lounge with Howland and Burnett. As the State repeatedly argued, Ali was watching defendant and his companions very carefully due to his fear that they were going to rob the bar. Ali’s credible testimony seriously undermines Debrah’s testimony that the defendant followed Willis out of the lounge and shot him.

Although the State attempted at trial to reconcile these conflicting accounts by suggesting that defendant could have waited in a vestibule between the two doors leading from the bar to the street, it presented no direct evidence of this. Acknowledging this fact, the State argues that its vestibule theory is a reasonable inference from the evidence. The theory, however, did not emerge until the State’s closing argument in rebuttal, and thus the defense had no opportunity to test it at trial. Moreover, Howland was never asked whether she had passed anyone in the vestibule on her way out of the bar, nor was Ali asked if this was an area in which someone could hide. Under the circumstances, we do not find the State’s inference reasonable.

We also find that Debrah’s credibility was repeatedly impeached with her signed statement given to defense investigator Waller five months before trial. Debrah testified that she did not use drugs every day around the time of the shooting, yet she signed a statement saying that she did. On the stand, she denied that she had been looking for her sister in order to go out and use drugs; however, she signed a statement which indicated that she had been. She testified initially that she had not seen Pepper at the police station. When confronted with her earlier signed statement, Debrah admitted that she had probably said that to the investigator. Later, Debrah admitted that she really had seen Pepper, and that he had been in handcuffs, but that she did not remember his being bloody.

Debrah’s alleged actions after the shooting also tend to undermine her credibility. According to Debrah, after witnessing the shooting, she did not go for help and did not call the police. Instead, according to her testimony, she went into a bar to look for her sister, then went to another bar, had a few drinks, and finally went to her stepmother’s. Moreover, Debrah did not tell the police that she had witnessed the shooting until two days later, when she found her sister at the 51st Street police station under suspicion of involvement with the murder.

Finally, the record indicates that Debrah had a motive to falsely implicate defendant because a possible alternative suspect, Herbert Stevens, was the boyfriend of her sister Ronda. There is testimony from Debrah that the police were attempting to implicate Ronda in having provided the gun to the gunman. By identifying defendant, rather than Stevens, Debrah exonerated her sister’s boyfriend, and at the same time may have deflected suspicion away from her sister.

In sum, although the testimony of a single witness is sufficient to convict 
if positive and credible 
(
Morehead
, 45 Ill. 2d at 330; 
Hampton
, 44 Ill. 2d at 45; 
Glover
, 49 Ill. 2d at 84-85), given the serious inconsistencies in, and the repeated impeachment of, Debrah Caraway’s testimony, we find that no reasonable trier of fact could have found her testimony credible. Moreover, the circumstantial evidence tending to link defendant to the murder merely narrowed the class of individuals who may have killed the victim, without pointing specifically to defendant. Two other men were with defendant on the night of the shooting. They, like defendant, were also wearing dark clothing. Furthermore, Robin Howland and Maggie Burnett, who were standing only a few feet from the gunman at the time of the shooting, were unable to identify defendant.

What is involved here is the standard of proof which is applicable to all crimes. That is to say, conviction beyond a reasonable doubt. Whether the crime charged be trespass, shoplifting, armed robbery, or murder, the test is the same. The burden of meeting this standard falls solely on the prosecution. If it fails to meet this burden, a defendant is entitled to a finding of not guilty. No defendant is required to prove his innocence.

While a not guilty finding is sometimes equated with a finding of innocence, that conclusion is erroneous. Courts do not find people guilty or innocent. They find them guilty or not guilty. A not guilty verdict expresses no view as to a defendant’s innocence. Rather, it indicates simply that the prosecution has failed to meet its burden of proof. While there are those who may criticize courts for turning criminals loose, courts have a duty to ensure that all citizens receive those rights which are applicable equally to every citizen who may find himself charged with a crime, whatever the crime and whatever the circumstances. When the State cannot meet its burden of proof, the defendant must go free. This case happens to be a murder case carrying a sentence of death against a defendant where the State has failed to meet its burden. It is no help to speculate that the defendant may have killed the victim. No citizen would be safe from prosecution under such a standard.

It is our considered judgment that defendant was not proven guilty beyond a reasonable doubt. Accordingly, the judgment of the circuit court of Cook County is reversed.

Judgment reversed
.

JUSTICE RATHJE took no part in the consideration or decision of this case.