NOTICE
Decision filed 05/14/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240806-U

NO. 5-24-0806

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 20-CF-58 |
| | ) | |
| CLOANGER ROBINSON, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore* and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence at trial was sufficient to support the jury's verdicts finding the defendant guilty of three counts of first degree murder and that the defendant failed to establish that he acted in self-defense; the defendant's claim that he was limited during cross-examination of an eyewitness was forfeited, because he failed to provide an offer of proof; the circuit court's denial of the defendant's request for a mistrial was not an abuse of discretion; the trial court's decision to deny the defendant's request for expert witness funds on matters of juvenile maturity and brain development was not an abuse of discretion. The case must be remanded to allow the defendant to seek a waiver of court pursuant to Illinois Supreme Court Rule 472 (eff. May 17, 2019).

¶ 2    Following a jury trial, the defendant, Cloanger Robinson, was convicted of first degree

murder. The State charged the defendant with nine counts of first degree murder. The defendant's

* Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

convictions resulted in some counts merging with others, and he was ultimately sentenced on three of the nine counts. The circuit court sentenced the defendant to three mandatory terms of life in prison and ordered the defendant to pay $799 in court costs. On appeal, the defendant contends that his convictions must be vacated because all were based on the "incredible" testimony of a witness who had a motive to falsely implicate him, the remaining evidence against him was insufficient, and the State failed to disprove the defendant's claim of self-defense involving one victim. The defendant asserts that the circuit court improperly limited his cross-examination of a witness about the plea deal that witness reached with the State in exchange for testimony against the defendant. He also argues that the circuit court erred in denying his motion for a mistrial after the State used a video of the defendant's interrogation without redacting prejudicial and irrelevant statements. He contends that the circuit court erred in denying his request for funds for an expert at sentencing, and finally argues that defense counsel provided ineffective assistance for failing to seek a waiver of court assessments pursuant to Illinois Supreme Court Rule 404 (eff. July 1, 2019).

¶ 3    For the following reasons, we affirm the defendant's convictions and sentences. We remand this case with directions to consider the defendant's request that court assessments be waived.

¶ 4                                    I. BACKGROUND

¶ 5    A jury trial provided the following evidence. On January 23, 2020, a 911 call was made regarding an incident in a Danville residence at 440 Elm Street. Officer Eric Kizer responded to the call. Upon his arrival at the residence, he encountered Makia Jones (Makia). Inside the house, Officer Kizer found three bodies. He also found one knife outside of the house. The decedents were identified as Nathaniel Gentry (Gentry), Anthony Jones (Jones), and Cordell Reed (Reed).

2

¶ 6     Makia testified that she is the defendant's mother. The defendant is the oldest of her seven children. Makia grew up with her great-grandmother at 440 Elm Street where the murders occurred. Her grandmother owned a house directly across the street. At the time of the murders, Jones and Reed were residents of 440 Elm Street. Makia testified that because of her substance abuse issues, she sometimes lived at 440 Elm Street and sometimes lived across the street at her grandmother's house. If any of Makia's children, including the defendant, needed her, they knew to go to 440 Elm Street.

¶ 7     Earlier in January 2020, Makia was living with Maurice "Rico" Williams (Rico) and two of her daughters. At an unspecified time prior to January 22, 2020, Rico threw Makia and her two daughters out of his house. On the morning of January 22, 2020, Makia and her cousin, Terri "Twin" Duckworth (Twin), saw the defendant and told him that Rico threw her out of his house. Makia told the defendant that later in the day she would be back at 440 Elm Street. However, she did not arrive there until the following day, when she discovered the bodies of her uncles: Gentry, Jones, and Reed.

¶ 8     Terry Severado (Severado) and Derric Hightower (Hightower) testified that they socialized with Gentry, Jones, and Reed on January 22, 2020. Hightower testified that he met Reed at 440 Elm Street and drove him to get a television. He then drove Reed back to Reed's house and told him he would return after work. Severado testified that he was also at 440 Elm Street on January 22, 2020, socializing with Jones and Reed. While the men were socializing, there was a knock at the door. When Reed answered, the defendant, who he knew as Reed's nephew, came into the house with two other men.

¶ 9     Severado testified that the defendant asked Reed to call him a cab, which Reed did. The defendant introduced Severado to the two other men as the "Tinsley boy" and the "Myles boy."

3

Reed noticed that they were all wearing latex gloves. Reed asked about the gloves and was told that they were to protect them from the cold. Severado testified that the cab came and left without picking up the defendant and the two other men. Severado and Jones left to go to Severado's house where they ate, drank beer, and socialized until Jones left at about 7:40 p.m.

¶ 10     Detective Jon Stonewall with the Danville Police Department narrated a McDonald's restaurant surveillance video retrieved during the investigation. He testified that the McDonald's restaurant was a 25-to-30-minute walk from 440 Elm Street. On January 22, 2020, at 6:34 p.m., the defendant, Terrion Tinsley (Tinsley), and Myles Brown (Brown) were seen on the video entering that McDonald's restaurant. In a second surveillance video from that restaurant, the defendant was seen at 8:10 p.m. In this second video, the defendant and Brown were seen putting on latex gloves and then putting on other gloves over the latex gloves.

¶ 11     Detective Stonewall canvassed Collett Street in Danville because Brown and the defendant were both known to live on that street. The police found clothing that had been worn by the defendant (seen on the McDonald's video) in a trash can at Brown's address. Sergeant Andrew Brooks recovered the clothing from the trash can which included jeans, a jacket, and blue and white Air Jordan athletic shoes. Officers also found clothing and shoes identified as having been worn by Tinsley and Brown. Sergeant Brooks also searched the area near the 440 Elm Street residence and located six plastic gloves and six knit gloves from a nearby storm drain.

¶ 12     Sergeant Timothy Lemasters with the Illinois State Police photographed the crime scene and victims. Sergeant Lemasters testified to locations with bloodstains in the middle room which contained a sofa, television, electronic keyboards, and a door leading to the kitchen. A broken denture was found near the bodies. Recovered evidence near Gentry's body included a knife bent at a 90-degree angle, a straight blade, and a black knife handle. Closer to Reed's body was a broken

4

knife and a bloody baseball bat. A bloodstained Casio keyboard was found in front of the television.

¶ 13    Phillip Wilson, a retired Danville Police Department detective, testified that he interviewed the defendant on January 23, 2020. During the interview, the defendant stated that he had no mobile phone, and his mother had just been kicked out of Rico's home, so to contact his mother, he needed to either contact his grandmother or go to 440 Elm Street. On the evening at issue, the defendant met up with Tinsley and Brown and waited for his mother at 440 Elm Street. The defendant stated that between 6 and 6:30 p.m., he, Tinsley, and Brown had been at a McDonald's restaurant. Thereafter, they went to 440 Elm Street. At some point, Brown used Reed's phone to order a cab, but upon arrival, the cab driver did not wait. The defendant, Tinsley, and Brown left the house on foot and returned to McDonald's where they stayed until approximately 8 to 8:30. The defendant denied that the purpose of the visit to 440 Elm Street was to obtain marijuana.

¶ 14    The interview then shifted to responsibility for the deaths of Gentry, Jones, and Reed. Detective Wilson informed the defendant that Tinsley and Brown were saying that the defendant killed the three men. The defendant denied killing the men and said that Tinsley and Brown murdered them while he was outside of the house. When Brown exited the house, he told the defendant about the murders. The defendant told Detective Wilson that he, Tinsley, and Brown went to 440 Elm Street to get marijuana from Twin, but upon arrival, Twin was not there. Instead, they got marijuana from Reed.

¶ 15    During further questioning, the defendant stated that when he, Tinsley, and Brown arrived at 440 Elm Street, the men in the house told them to remove their hoodies. Hightower left the house, and then the defendant asked Reed for marijuana. Reed gave him some marijuana, and then Tinsley asked the defendant to get more from Reed. The defendant stated that he repeatedly told

5

Tinsley that because Tinsley had a "baby face," he did not think that Reed would agree to give them more marijuana. Tinsley then asked the defendant how much money Reed would want for the remainder of the marijuana at the house. Again, the defendant told Tinsley that he did not think that Reed would give them more. Tinsley then directly asked Reed about the marijuana and Reed said that he would not provide more marijuana because Tinsley was "a little kid," which resulted in an argument. During the argument, Brown attempted to grab the remaining marijuana, and everyone in the house began "wrestling."

¶ 16 When the men began fighting, the defendant stated that he could not see where Jones was, but knew he was in the room where the fight was taking place. The defendant observed Gentry using a razor as a weapon. Then, Tinsley grabbed a knife from a table and began stabbing people in the room. While the defendant did not know who stabbed Reed or Jones, the defendant stated that Tinsley stabbed Gentry. Jones was then under a table and attempted to leave, but Brown chased him down and "whooped on him." The defendant said that all fighting took place in the middle room of the house.

¶ 17 Detective Wilson informed the defendant that Brown told him that the defendant used the keyboard as a weapon. He also told the defendant that he believed the defendant stabbed someone that night. The defendant denied any part of the attack, stating that his goal in going to 440 Elm Street was twofold: first, he intended to obtain marijuana; second, he hoped to meet up with his mother who would allow him and his girlfriend to stay over at the 440 Elm Street house, because his grandmother and great-grandmother refused to allow his girlfriend to stay at their house.

¶ 18 Instead of being charged with murder, Brown was allowed to plead guilty to a juvenile robbery charge in exchange for testifying against the defendant and Tinsley. Brown testified that he and Tinsley were friends, and he knew the defendant through Tinsley. On that date, they went

6

to McDonald's and then to 440 Elm Street. He testified that while at 440 Elm Street, there was no fight or argument that preceded the murders. He testified that Gentry was seated in a recliner with the defendant standing nearby, while he and Tinsley were seated on a small sofa. According to Brown, Reed was standing in front of Tinsley and Jones "and then [the defendant], he, like, standing right there, moving around, like, moving around the house and stuff, then go behind the recliner, and then out of nowhere, he stabbed the dude, the dude that was in the recliner." Brown also stated that Tinsley stabbed Reed and used "the piano" to hit "one in the head" while the defendant used the baseball bat. Brown did not say which victims were attacked with the keyboard and the baseball bat. He admitted that in his January 23, 2020, statement to the detectives, he never mentioned the defendant's use of a baseball bat. Brown admitted wearing latex gloves on the night of the murders, but denied hiding clothes in an area trash can.

¶ 19    The defendant's attorney asked Brown on cross-examination: "if you were charged with first degree murder, you would be looking at a life sentence in prison?" The State's objection to this question as being both speculative and argumentative was sustained.

¶ 20    The State presented evidence regarding the injuries sustained by the three victims. Gentry died from "multiple blunt head injuries and a stab wound of the back." The stab wound was consistent with a single-edge knife like a kitchen or steak knife. Jones died from "multiple blunt injuries and a stab wound of the back." Jones sustained two stab wounds on his back, both consistent with a "straight-blade knife." However, Jones's most significant injuries were to his head and skull. Reed died from a stab wound to the left side of his chest consistent with having been made by a knife with a single-edge blade, and he also sustained blunt force trauma to his heart and his head. Reed's head injuries were consistent with those sustained by Gentry and Jones.

¶ 21 Both the Casio keyboard and the baseball bat were found to have been consistent with causing the blunt force trauma suffered by all three victims. Trace evidence collected from the bat showed Gentry as a possible contributor of two blood samples and Jones as a possible contributor of one blood sample. No evidence tied any other individual to the bat. The Casio keyboard had three blood samples attributed to Gentry, but all others were excluded. Evidence from a straight shaving blade showed Gentry as a major contributor with Reed as a possible minor contributor, with all others excluded. Evidence from a bent knife showed Gentry as a major contributor. Evidence from a knife blade showed both Gentry and Reed as contributors, while a straight-blade knife handle showed Gentry as a possible contributor with all others excluded. Another bent blade showed Gentry and Jones as possible contributors, and a different knife blade included Gentry as a possible contributor with all others excluded.

¶ 22 There were multiple tests on the latex and knit gloves and other clothing items. One set of black and latex gloves established Tinsley as a possible contributor. Another set showed the defendant as a possible major contributor. Blood samples from a pair of jeans included Gentry, Jones, and the defendant as possible contributors. A pair of Air Jordan shoes contained blood samples that possibly included Gentry, Reed, and the defendant. Clothing known to have been worn by Brown was not tested.

¶ 23 The defendant testified at trial. He admitted that he lied to police during his interview. He had lived at 703 Collett in Danville with his grandmother and six other siblings and stated that his mother was "on drugs" and his father was in prison. On January 22, 2020, the defendant's girlfriend dropped him off at his grandmother's house. He left his grandmother's house to meet up with Tinsley and Brown at Brown's house. On the way, he ran into his mother and Twin. He attempted to ask his mother about the Rico situation, but she said nothing other than that she would

8

be at 440 Elm Street later. The defendant then went to Brown's girlfriend's house, and they all went to a Walgreens store to purchase latex gloves because it was cold and his gloves were too thin. Then, they went to the McDonald's restaurant where Brown's brother worked.

¶ 24    The defendant testified that he had been at 440 Elm Street twice during the evening of January 22, 2020. While at the house the second time, he got into a fight with Gentry. He began wrestling with Gentry and then Jones jumped on his back. After Brown intervened in his fight with Gentry, Jones let him go. Then, Gentry pulled a straight-edge razor out of his pocket and rushed toward him. The defendant and Gentry again began wrestling on the ground while the defendant tried to keep Gentry from stabbing him. After both men slipped on blood that was on the floor, the defendant grabbed a baseball bat and hit Gentry "more than once" until Gentry fell to the floor. The defendant denied stabbing Gentry and also denied seeing anyone using the Casio keyboard as a weapon. He testified that he saw Brown in the kitchen hitting Jones with the bat. Thereafter, he, Tinsley, and Brown left 440 Elm Street, removed their gloves, and thew them in the storm drain. They then went to the defendant's grandmother's house, where he changed out of the clothing he had worn at 440 Elm Street. The defendant said that Brown grabbed a bag with the defendant's clothing and took it with him when he and Tinsley left.

¶ 25    After being instructed on both first degree murder and second degree murder, the jury ultimately found the defendant guilty of first degree murder of all three men and that the defendant's conduct was brutal and heinous. The defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which was denied. For sentencing purposes, the defendant's attorney filed a motion requesting funds to explore the issue of the defendant's maturity and brain development because of his age when the crimes were committed. The State asked the court to strike the motion because the first degree murder charges mandated

life sentences rendering the motion meritless. The circuit court denied the motion. The defendant was sentenced to three mandatory life terms. This appeal followed.

¶ 26                                    II. ANALYIS

¶ 27                        1. Guilt Beyond a Reasonable Doubt

¶ 28    The defendant argues on appeal that the evidence was insufficient to prove that he committed first degree murder. With respect to Gentry, the defendant alternatively contends that his actions were made in an unreasonable belief in his need to act in self-defense. He asks this court to find that the evidence was insufficient to find him guilty of Gentry's murder or, alternatively, reduce his conviction for Gentry's murder to second degree. He also contends that Brown's testimony was not credible.

¶ 29    "It is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the finder of fact." *People v. Langston*, 2024 IL App (5th) 220296, ¶ 33 (citing *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26). "A reviewing court gives the State the benefit of all reasonable inferences." *Id.* (citing *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007)). We will only reverse a defendant's conviction if "the evidence is 'so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt.' " *Id.* (quoting *Wheeler*, 226 Ill. 2d at 115). The jury has the duty "to assess the credibility of the witnesses, assign the appropriate weight to testimony, and resolve discrepancies in the evidence." *Id.* (citing *People v. Evans*, 209 Ill. 2d 194, 211 (2004)).

¶ 30    Brown testified that he was friends with Tinsley, but also knew the defendant, and that the three young men went to a local McDonald's restaurant and then to 440 Elm Street. He testified that there was no argument or fight between the young men and Gentry, Jones, and/or Reed. He carefully outlined where everyone at the 440 Elm Street house was seated that night. He testified

10

that Gentry was sitting in a recliner close to where the defendant was standing. The defendant then began moving around the house when "out of nowhere" the defendant stabbed Gentry. He testified that Tinsley stabbed Reed and hit him in the head with the Casio keyboard. The defendant used the baseball bat to strike the heads of all three victims. Brown acknowledged that in his initial January 23, 2020, statement to the police, he never told them that the defendant used a baseball bat. Brown said that he wore latex gloves on the night of the murders but denied hiding clothes in a trash can near his home.

¶ 31    When police initially interviewed the defendant, he denied any involvement in the murders, denied wearing latex gloves that night, denied being at the 440 Elm Street address twice on the night of the murders, denied giving Brown any clothing, and informed the police that he was wearing the same clothes at his interview that he had worn the previous night. The defendant also initially told police that Tinsley committed the murders. Later in the interview, he informed the police that there was a dispute that arose with the victims because Tinsley wanted more marijuana from Reed that resulted in everyone "wrestling," that Gentry had a long razor, that Tinsley stabbed Gentry, that Brown was striking the men with a Casio keyboard, and that he was unsure who stabbed Reed and/or Jones. He also informed the police that the clothing he wore that night was at his girlfriend's house.

¶ 32    At trial, the defendant testified that he wore latex gloves that night; that he went to 440 Elm Street twice; that he argued, physically wrestled with, and hit Gentry; that Jones jumped on his back; that Gentry had a straight-edge razor and threatened him with it; and that eventually he grabbed the baseball bat and struck Gentry more than once resulting in Gentry falling to the floor. The defendant testified that he did not stab Gentry, that Brown hit Jones with the bat, and denied that anyone used the Casio keyboard as a weapon. He stated that the three left 440 Elm Street

11

together, they disposed of the gloves in the storm drain, and all three went to his grandmother's house. Upon leaving the defendant's grandmother's house, Brown took the bag containing the defendant's clothing and left with Tinsley. The defendant acknowledged his lies during his initial police interview and that the clothing he was seen wearing in the McDonald's restaurant videos was the clothing he wore at the time of the murders.

¶ 33    DNA testing confirmed that the bat contained blood samples of two of the three victims. Further, DNA evidence recovered from the clothing worn by the defendant established that there was a substantial amount of blood on the front of the defendant's jeans, including blood from both Gentry and Jones; the defendant's jacket contained Jones's blood; and his shoes contained a large amount of blood matching the DNA of both Gentry and Reed.

¶ 34    The jury was ultimately tasked with determining witness credibility. "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). On appeal, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 35    The defendant argues that the State failed to establish any motive for his involvement in the murder of his uncles. While there was no express evidence of motive, other than the fact that an argument led to "wrestling," "[m]otive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder." *People v. Smith*, 141 Ill. 2d 40, 56 (1990).

¶ 36    The defendant's reliance upon *People v. Smith*, 185 Ill. 2d 532 (1999), is unavailing. There, the State's case was based upon the testimony of one witness who directly linked the defendant to

the murder. *Id.* at 542. Two other eyewitnesses did not identify the defendant as the shooter. *Id.* Additionally, there were significant conflicts between this one witness's testimony with testimony from a bartender who was present when the shooting occurred. *Id.* Further, the one witness's credibility was significantly impeached by her admission to police that she was a daily drug user at the time of the shooting, which conflicted with her trial testimony that she was not. *Id.* at 544. Moreover, the witness's credibility was impeached where, following the shooting, instead of contacting police or seeking immediate help, she went to look for her sister and ended up drinking at another bar. *Id.* Finally, the record indicated that the witness had a motive to falsely implicate the defendant because a potential alternative shooting suspect was her sister's boyfriend. *Id.* We find *Smith* to be distinguishable. Here, Brown's testimony was much stronger than that provided by the eyewitness in *Smith*. Brown's testimony that the defendant struck all three victims with the bat was supported by DNA evidence that the bat contained blood from two of the victims. Moreover, the clothing the defendant acknowledged he wore when the murders were committed contained blood from all three victims.

¶ 37    As previously stated, it is not the job of the appellate court to retry the case or substitute its judgment for that of the jury. *Langston*, 2024 IL App (5th) 220296, ¶ 33 (citing *Teague*, 2013 IL App (1st) 110349, ¶ 26). A thorough review of the record precludes any finding that "the evidence is 'so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt.' " *Id.* (quoting *Wheeler*, 226 Ill. 2d at 115).

¶ 38    We also find that the defendant's claim of self-defense to Gentry's murder charge is unfounded. " 'The use of deadly force is limited to those situations where (a) the threatened force will cause death or great bodily harm, or (b) the force threatened is a forcible felony.' " *People v.*

13

*Harmon*, 2015 IL App (1st) 122345, ¶ 52 (quoting *People v. Lee*, 243 Ill. App. 3d 1038, 1043 (1993)). Self-defense is defined in section 7-1(a) of the Criminal Code of 2012 as follows:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2018).

¶ 39　When a defendant makes a self-defense claim, the State then has the burden to prove both the elements of first degree murder and "that the use of force was not justified beyond a reasonable doubt." *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. In response to a self-defense claim, the State must refute at least one of the following six elements:

> "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995).

If the State refutes one of the six elements, the defendant's self-defense claim fails. *Id.*

¶ 40　The defendant contends that he established each self-defense element. He testified that he hit Gentry after Gentry pushed him and threateningly brandished a straight-edge razor and that they wrestled on the floor, but the defendant was able to push Gentry away. The defendant then grabbed the baseball bat which he used to strike Gentry "more than once" until Gentry fell to the floor. There is no evidence to corroborate the defendant's claim that Gentry was armed with a

14

straight-edge razor, and the defendant failed to identify any of the knives recovered from the murder scene as being the one with which Gentry allegedly threatened him.

¶ 41 As self-defense is a matter of fact, and where the defendant's testimony is contradicted by other admissible evidence, the jurors need not believe the defendant's claim. *Id.* Here, the defendant never told the police that he hit Gentry and/or otherwise acted in self-defense. The jury is allowed to consider the fact that the defendant raises self-defense for the first time at trial. *People v. Savickas*, 230 Ill. App. 3d 322, 330 (1992). The defendant acknowledged that he never informed the police that he struck Gentry with the baseball bat. At trial, the defendant testified that he hit Gentry with the bat "maybe three times." If an aggressor has been disarmed or disabled, use of deadly force cannot be justified. See *Lee*, 243 Ill. App. 3d at 1043; *People v. Murillo*, 225 Ill. App. 3d 286, 293 (1992) (" 'If one responds with such excessive force that one is no longer acting in self-defense but in retaliation, such excessive use of force renders one the protagonist; a non-aggressor has a duty not to become the aggressor.' " (quoting *People v. Nunn*, 184 Ill. App. 3d 253, 269 (1989))).

¶ 42 The jury is also allowed to consider actions taken by the defendant after leaving the crime scene and may infer consciousness of guilt based upon the evidence of a defendant's behavior after the crime. *People v. Williams*, 266 Ill. App. 3d 752, 760 (1994). Here, the defendant never told any family members about what happened; he did not contact law enforcement; he lied to police when interviewed; he attempted to hide the latex gloves he wore and removed and disposed of his clothing.

¶ 43 Given the use of force by the defendant against Gentry without any corroborating evidence that Gentry was brandishing a knife, and the defendant's newly argued claim of self-defense at trial, coupled with his actions taken after the murder to hide evidence and lie to police, we find no

15

basis to reduce the defendant's first degree murder conviction involving Gentry to second degree murder.

¶ 44                        2. Limitation of Cross-Examination of Myles Brown

¶ 45    The defendant next argues that the circuit court erroneously limited the cross-examination of Brown, when the defendant's attorney was trying to establish that Brown was the only one of three codefendants who was not "facing dying in prison" because he was allowed to plead to a juvenile robbery charge in exchange for his testimony against the defendant. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2018). The defendant's attorney attempted to ask Brown about his "sweet" deal to testify against the defendant in exchange for a plea to a juvenile crime instead of being faced with a murder charge. Defense counsel asked Brown what potential sentence he would have faced if he was charged with murder, whether he committed a robbery at 440 Elm Street that evening, and if he had to admit that he was a felon when applying for jobs. The State's objection to these questions was sustained. The defendant included this issue in his written posttrial motion.

¶ 46    Both the United States and Illinois Constitutions guarantee the defendant's right to confront witnesses against him. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The constitutional confrontation clauses allow the defense to expose possible bias by the State's witness, which allows the jury to make an informed judgment regarding the weight to be given the witness's testimony. *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974); *People v. Gonzalez*, 104 Ill. 2d 332, 337 (1984). Cross-examination as to bias is particularly relevant because "successful showing of bias on the part of a witness would have [the] tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel*, 469 U.S. 45, 51 (1984). A judge may restrict the defendant's presentation of evidence to prevent him from injecting irrelevant or unreliable evidence into the case. *Davis*, 415 U.S. at 316-18.

16

However, evidence presented by the defendant must be allowed when justice requires. *Id.* Admissibility of evidence is reviewed for an abuse of discretion. *People v. Taylor*, 2011 IL 110067, ¶ 26.

¶ 47 The State argues that the defendant forfeited the issue because he did not make an offer of proof to inform the circuit court of the substance of the anticipated evidence. An adequate offer of proof at trial is "the key to preserving *** an error in the exclusion of evidence" for review, and "a defendant's failure to make such an offer results in forfeiture of the issue." *People v. Staake*, 2017 IL 121755, ¶ 51. The intent of an offer of proof " 'is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced.' " *People v. Way*, 2017 IL 120023, ¶ 33 (quoting *People v. Peeples*, 155 Ill. 2d 422, 457 (1993)). The offer of proof must go further than a mere conclusory summarization of the evidence. *Id.* (citing *People v. Andrews*, 146 Ill. 2d 413, 421 (1992)). Here, the defendant's counsel made no offer of proof as to what evidence was being potentially excluded. Thus, we find that this issue was forfeited. Forfeiture aside, the defendant's argument is meritless.

¶ 48 Cross-examination regarding a witness's potential sentence and/or actual juvenile punishment can be inappropriate if it could reveal the potential sentence that a defendant faces. *People v. Brewer*, 245 Ill. App. 3d 890, 891-93 (1993); *People v. Lake*, 61 Ill. App. 3d 428, 431-32 (1978). "The purpose of preventing disclosure of the potential sentence facing the defendant is that such evidence is irrelevant to the jury and could possibly prejudice the State's right to a fair trial." *Brewer*, 245 Ill. App. 3d at 892. Any additional questioning about a witness's plea deal to include the number of years the witness could have faced would have unduly prejudiced the State's right to a fair trial because the defendant on trial faced the same criminal charge. *People v. James*, 2013 IL App (1st) 112110, ¶¶ 57-58; see also *People v. Arroyo*, 339 Ill. App. 3d 137, 150 (2003).

17

¶ 49    When defense counsel asked whether Brown would need to admit he was a felon if he applied for a job, the State's relevance objection was sustained. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); see also *People v. Bush*, 2023 IL 128747, ¶ 62. We agree with the circuit court's conclusion that asking Brown whether he would have to "check the felon box" on a future employment application was irrelevant to the issue of the defendant's guilt or innocence. The question was also inadmissible because Brown's future employment application involved a collateral matter. *People v. Marshall*, 2025 IL App (4th) 240368, ¶ 58 (" 'Although a witness' testimony may be impeached with evidence which tends to contradict or undermine its believability [citations], such contradictory evidence may not be offered if it is merely collateral to the issues in the case.' " (quoting *People v. Abrams*, 260 Ill. App. 3d 566, 579 (1994))). We find that the defendant was not denied the right to properly and thoroughly cross-examine Brown and affirm the circuit court's evidentiary rulings on these issues.

¶ 50                     3. Denial of Motion for Mistrial

¶ 51    The video of the defendant's interview with police was played for the jury. The jury heard the following statement, which the defendant claims should have been redacted:

"THE DEFENDANT: Yeah. I don't know if that was probably one of my uncle Cordell knifes [*sic*] then. Probably, I don't know but they was, they was picking nice [*sic*]. But like I, what I was saying with the whole set up thing is because like, like I just said, they know I got a bad, a bad background or whatever so they know. Yes. Like with y'all, like right know [*sic*] how you said, you don't believe that I was, you feel me like what you say? You don't believe that. I like I tried to say, oh well, he told me this, you know, that's

18

bullshit. I don't, I don't believe, I don't believe that. But as soon as they told you that I had something to do with it, you did believe it though. I [*sic*] wasn't hard to believe it, was it.

DETECTIVE WILSON: It's not hard to believe, no, based on your background."

Defense counsel requested a mistrial because the jury heard Detective Wilson agree with the defendant's statement that "it wasn't hard to believe that [the defendant] would have murdered three people based on his background." Defense counsel indicated that he believed that section of the defendant's interview was supposed to have been removed, but acknowledged that this was based upon an email to the State that "did not mention those specific words" but did mention something that was at approximately the same time stamp on the video where Detective Wilson agreed with the defendant's statement about his "background."

¶ 52    The circuit court denied the motion noting that the defense could have reviewed the video for redactions before it was played in court. The next day, defense counsel again raised the issue, noting that it had specifically asked for that portion of the interview to be redacted; that the State had agreed to do so, but that section was still played for the jury. Defense counsel acknowledged that there had been two references to the defendant's criminal background, and that while one was muted so that the jury would not hear it, the second reference remained intact, and the jury heard those characterizations of the defendant's background. The circuit court again denied the motion for a mistrial.

¶ 53    A circuit court's denial of a defendant's mistrial request is reviewed for an abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). We will not reverse a circuit court's decision regarding other-crimes evidence "unless the trial court's decision is ' " 'arbitrary, fanciful or unreasonable' " or " 'where no reasonable man would take the view adopted by the trial court.' " ' " *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 27 (quoting *People v. M.D.*, 101 Ill.

19

2d 73, 90 (1984) (Simon, J., dissenting), quoting *Peek v. United States*, 321 F.2d 934, 942 (9th Cir. 1963)). "Other-crimes evidence is generally not admissible to show the defendant's propensity to commit a charged offense." *Id.* ¶ 26 (citing *Donoho*, 204 Ill. 2d at 170).

¶ 54 If evidence of the commission of other crimes is admitted at trial, although inadmissible to show a disposition or propensity to commit crimes, the admission of this type of evidence may suggest that the defendant committed the crime at issue. *People v. Lucas*, 151 Ill. 2d 461, 485 (1992) (citing *People v. Thingvold*, 145 Ill. 2d 441 (1991); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 404.5 at 190 (5th ed. 1990)). "The underlying rationale is that such evidence is objectionable 'not because it has no appreciable probative value, but because it has too much.' " (Internal quotation marks omitted.) *Id.* (quoting *People v. Romero*, 66 Ill. 2d 325, 330 (1977)).

¶ 55 The State argued that the jury heard opening statements delivered by the defendant's attorney about his difficult upbringing, and later heard testimony from his mother, Makia, who testified that because of her drug use, she could not provide or care for her seven children and rarely saw them. Makia also testified that the defendant's father was imprisoned. The defendant also testified about his mother's instability and his father's imprisonment. The State contends that the opening statements and the testimony of Makia and the defendant provided the jury with ample evidence to explain the comment about the defendant's "background" as referencing his parents and upbringing. Moreover, the jury heard no testimony that the defendant had prior convictions or was otherwise involved in any other offenses.

¶ 56 Here, the circuit court commented that it found the comment about the defendant's "background" to be innocuous. The court stated that the term "background" may have a specific meaning relative to a criminal defendant when considered by the court, law enforcement, and/or

20

attorneys. However, to the lay persons of the jury, the word could have "meant anything," including his school record or family history. We agree with the circuit court that "background" is not synonymous with criminal convictions. Because we do not find that the court's decision was " ' "arbitrary, fanciful or unreasonable" ' " (*Donoho*, 204 Ill. 2d at 182 (quoting *M.D.*, 101 Ill. 2d at 90 (Simon, J., dissenting), quoting *Peek*, 321 F.2d at 942)), we conclude that the circuit court did not abuse its discretion in denying the motion for mistrial.

¶ 57 Alternatively, the defendant argues that his counsel was ineffective. The defendant's attorney was provided with an opportunity to review the exhibits before trial began to discuss any requested redactions and to review the video after the redactions were made. Defense counsel failed to do so. Additionally, as defense counsel was unaware that the "background" comment had not been redacted, no pretrial objection was made. After agreeing to the admission of the video into evidence, defense counsel waited to object until after the jury had viewed it. Further, defense counsel failed to ask the court to give a limiting instruction regarding the "background" comment.

¶ 58 To establish that counsel was ineffective, a defendant must show that (1) his attorney's performance was objectively unreasonable and (2) the defendant suffered prejudice as a result. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); see also *Strickland v. Washington*, 466 U.S. 668, 690-92 (1984). We review ineffective assistance claims *de novo*. *People v. Lewis*, 2022 IL 126705, ¶ 48.

¶ 59 For the prejudice prong of the *Strickland* test, a defendant must show that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Emerson*, 122 Ill. 2d 411, 427 (1987). If the defendant fails to meet the burden of proving either prong, the claim fails.

21

*People v. Bell*, 2021 IL App (1st) 190366, ¶ 62; *People v. Beasley*, 2017 IL App (4th) 150291, ¶ 26.

¶ 60 We can dispose of an ineffective assistance of counsel claim without considering and addressing counsel's performance. *People v. Johnson*, 2021 IL 126291, ¶ 53. "[I]f it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient." *Id.* (citing *People v. Givens*, 237 Ill. 2d 311, 331, (2010)). As stated above, failure to object to the "background" comment was not prejudicial. Accordingly, the defendant's ineffective assistance claim on this issue fails.

¶ 61 4. Circuit Court's Denial of Request for Expert Funds for Sentencing as a Young Adult

¶ 62 The defendant next argues that the circuit court abused its discretion in denying his request for funds to hire a mitigation expert on juvenile maturity and brain development relevant to the defendant's emerging adult status for purposes of sentencing. "Expert testimony is proper where such testimony is needed to explain matters beyond the common knowledge of ordinary citizens, and where such testimony will aid the fact finder in reaching its conclusion." *People v. Bennett*, 376 Ill. App. 3d 554, 571 (2007).

¶ 63 "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). In *Miller* (*id.* at 479), the United States Supreme Court held that a mandatory sentence of life without the possibility of parole violates the eighth amendment when imposed on a juvenile murder defendant. Although the Supreme Court recognized that youthful characteristics do not disappear when an individual turns 18 (see *Roper*, 543 U.S. at 574), the Court limited its holdings to defendants who were under

22

the age of 18 when they committed their offenses, reasoning that the line must be drawn somewhere. *Miller*, 567 U.S. at 465; see also *People v. Harris*, 2018 IL 121932, ¶ 56 (noting the Supreme Court has never extended its reasoning to young adults over the age of 18). In *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Supreme Court held that *Miller* was to be construed retroactively; see also *People v. Davis*, 2014 IL 115595, ¶ 42 (*Miller* made retroactive to Illinois cases on collateral review).

¶ 64    The defendant argues that because he had just turned 18 when he was charged with the murders, the court should have considered the factors in mitigation listed in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2018)). This statutory section contains the following mitigating factors derived from *Miller* that a circuit court must consider when sentencing someone for an offense committed as a juvenile:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

23

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. ***" *Id.* § 5-4.5-105(a).

While *Miller* only directly applies to offenders under the age of 18 (see *Harris*, 2018 IL 121932, ¶ 58), the Illinois Supreme Court has held that " 'emerging adult' defendants between 18 and 19 years old [are not foreclosed] from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development." *People v. Clark*, 2023 IL 127273, ¶ 87 (citing *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44; *Harris*, 2018 IL 121932, ¶¶ 1, 48).

¶ 65　　The defendant's attorney argued that the defendant's natural life sentence violated the proportionate penalties clause of the Illinois Constitution and asked the court for funds to engage the "services of an expert to determine whether Defendant's own specific characteristics, related to youth, level of maturity, and brain development place him in the same category as juvenile offenders ***." At the hearing, the defendant's attorney argued that "a mandatory life sentence is unconstitutional as applied to an 18-year-old, based on *** [his] specific stage of brain development ***."

¶ 66　　The proportionate penalties clause in the Illinois Constitution provides protection regarding sentences in that penalties must be framed " 'with the objective of restoring the offender to useful citizenship.' " *People v. Hilliard*, 2023 IL 128186, ¶ 20 (quoting Ill. Const. 1970, art. I, § 11). A sentence violates this clause if it is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Id.* (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002)). A sentence of "any length" can violate the clause. *Id.* ¶ 29. Although recent decisions of the Illinois Supreme Court have limited *Miller*-based eighth amendment challenges for

24

emerging adults, they have not foreclosed emerging adults from raising as-applied sentence challenges under the proportionate penalties clause of the Illinois Constitution. See *People v. Williams*, 2024 IL 127304, ¶ 29. Such as-applied challenges remain viable for emerging adults who can present evidence that their brains were like juvenile brains at the time of the offense. *Harris*, 2018 IL 121932, ¶¶ 45-46; *Thompson*, 2015 IL 118151, ¶¶ 38-40.

¶ 67 Illinois law provides that under certain circumstances, an indigent defendant's constitutional protections may be violated by the denial of funds to secure an expert witness. *People v. McCoy*, 281 Ill. App. 3d 576, 582 (1996). The test for determining if constitutional protections are triggered by a request for funds to hire an expert is not whether the expert's testimony is useful, helpful, valuable, or even important to the defense, but whether the testimony is " 'crucial' to the defense or goes to the 'heart of the defense.' " *People v. Keene*, 169 Ill. 2d 1, 7-8 (1995). Whether an indigent's request for funds to hire an expert raises constitutional protections will vary with the circumstances in each case. *Id.* at 7. "Where no constitutional right is implicated, the decision to appoint an expert, or to authorize funds to hire an expert, rests within the sound discretion of the circuit court." *People v. Richardson*, 189 Ill. 2d 401, 422 (2000); see also *In re T.W.*, 402 Ill. App. 3d 981, 986 (2010).

¶ 68 We do not conclude that use of an expert witness was critical to support the defendant's as-applied claim of a proportionate penalties clause violation. Counsel could have presented evidence regarding the defendant's youth, level of maturity, and brain development to place him in the same category as *Miller*-like juvenile offenders. That testimony was available from his presentence report, family members or friends, educational or medical records, and existing scientific studies or articles on brain development. Regarding the issue of whether the defendant's request for an expert witness was crucial to his sentencing hearing, the defendant's written motion

provided no evidence to support the need for an expert witness, failed to identify any proposed expert, and further, failed to provide an estimate of the costs. We find no basis in the record to conclude that the circuit court's denial of the defendant's request for an expert witness constituted an abuse of discretion. *Richardson*, 189 Ill. 2d at 422.

¶ 69            5. Counsel's Failure to Seek Waiver of Court Assessments

¶ 70    As part of his sentence, the defendant was ordered to pay $799 in costs. The defendant's final argument on appeal is that his trial counsel was ineffective for failing to file an application and/or certification for a waiver of court assessments pursuant to Illinois Supreme Court Rule 404 (eff. July 1, 2019).

¶ 71    Rule 404 provides:

"In any case where a party is represented by a criminal legal services provider or an attorney in a court-sponsored *pro bono* program, the attorney representing that party shall file a certification with the court, and that party shall be allowed to proceed without payment of assessments as defined in 725 ILCS 5/124A-20(a) without necessity of an Application under this rule." Ill. S. Ct. R. 404 (eff. July 1, 2019).

¶ 72    The State agrees, as do we, that defense counsel's failure to file a Rule 404 certificate was objectively unreasonable. Illinois Supreme Court Rule 472 provides:

"(a) In criminal cases, the circuit court retains jurisdiction to correct the following sentencing errors at any time following judgment and after notice to the parties, including during the pendency of an appeal, on the court's own motion, or on motion of any party:

(1) Errors in the imposition or calculation of fines, fees, assessments, or costs;

* * *

26

(c) No appeal may be taken by a party from a judgment of conviction on the ground of any sentencing error specified above unless such alleged error has first been raised in the circuit court. When a post-judgment motion has been filed by a party pursuant to this rule, any claim of error not raised in that motion shall be deemed forfeited.

\*\*\*

(e) In all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472 (eff. May 17, 2019).

¶ 73    Accordingly, pursuant to Rule 472, we remand this case to provide the defendant with the opportunity to file an application for a waiver of court assessments pursuant to Rule 404.

¶ 74                                  III. CONCLUSION

¶ 75    For the above reasons, we affirm the defendant's convictions and remand the case so that the defendant may request a waiver of the costs imposed pursuant to Illinois Supreme Court Rule 404.

¶ 76    Affirmed and remanded with directions.